# United States Court of Appeals
## For the First Circuit

---

No. 01-1915

LINDA GRAY,

Plaintiff, Appellant,

v.

GENLYTE GROUP, INC.,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Lynch, Circuit Judge,

and Gertner,* U.S. District Judge.

---

Mark D. Stern with whom Mark D. Stern, P.C. was on brief for appellant.
Brian H. Lamkin with whom Timothy P. Van Dyck, Edwards & Angell, LLP, Dorothy Pitt and Pitt, Fenton & Smith were on brief for appellee.

---

*Of the District of Massachusetts, sitting by designation.

BOUDIN, Chief Judge. This appeal stems from Linda Gray's suit in the district court charging Genlyte Group with liability under Massachusetts law for sexual harassment. The jury returned a special verdict for Genlyte, finding that Gray had been subject to sexual harassment by a Genlyte employee but not through conduct sufficiently severe or pervasive to warrant liability. Gray now appeals, claiming errors in the instructions to the jury and in rulings on admissibility of evidence.

We begin with a brief synopsis of the evidence on both sides. In assessing sufficiency-of-the-evidence claims, we normally only consider the evidence in the light most favorable to the verdict. Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 39 (1st Cir. 2002). However, for most other kinds of questions ( e.g., admissibility, the appropriateness of jury instructions, plain or harmless error), evidence offered by either side or both may be pertinent. See id.

Gray worked from 1980 to 1998 at Genlyte's Lightolier plant in Fall River, Massachusetts. In her subsequent trial, she claimed that she was harassed in 1981 by Jose Hermenegildo, another Genlyte employee, for a few weeks. In particular, Hermenegildo allegedly stared at Gray and made tongue gestures mimicking oral sex. Gray did

not report this conduct to Genlyte.  It ceased when her boyfriend--a co-worker at the factory--threatened Hermenegildo.

Fourteen years later, in 1995, the harassment resumed after her boyfriend moved to a different shift.  According to Gray, Hermenegildo's harassment included statements (e.g., "Do you like to kiss?"); gestures (grabbing his crotch, sexual tongue gestures); and contact (touching her hair and--on one occasion--grabbing and shaking her while asking why she was avoiding him).  Gray testified that in other instances Hermenegildo's conduct appeared threatening.  He watched her in the parking lot before and after work, approached her at work, stared at her, and once followed her and her children home in his car.

At trial, Gray claimed that she had reported some or all of the harassment to her supervisor, Joe Pavao, and his supervisor, Bill Torrence, and nothing had been done.  However, Torrence said that she had told him only that Hermenegildo was watching her and invited Torrence to observe him on a specific occasion; further, he said she later told him that she had taken care of the problem herself.

According to Gray, Hermenegildo's misbehavior diminished in 1996, but she began to fear him after learning in that year that he had beaten his wife.  In 1997, Hermenegildo's earlier alleged misconduct resumed and in August 1997, Gray reported it to her supervisor and also provided a laundry list of his conduct in 1981 and 1995.

-3-

Gray testified that following her detailed complaint in August 1997, her supervisors took no significant action to investigate her claims or discipline Hermenegildo. Shortly after the meeting, Gray suffered a severe panic attack and was treated for continuing emotional distress. She did not return to work for the rest of 1997 but retained a lawyer who wrote to the company. The company took no action. Gray then filed a charge with the Massachusetts Commission Against Discrimination ("MCAD"). Mass. Gen. Laws (M.G.L.) ch. 151B § 5 (2000).

When Gray returned to work in January 1998, she said that Hermenegildo howled at her and followed her in the parking lot. In August 1998, Gray and other workers testified about Hermenegildo's misbehavior at a workers' compensation proceeding brought by Gray. In September 1998, Hermenegildo allegedly made an offensive tongue gesture at Gray and threatening gestures against another employee (Ray Tisdale) who testified at the August 1998 hearing.

Gray testified that due to emotional distress, she had been unable to work at the plant or elsewhere from September 1998 onward. In March 1999, she filed a criminal charge against Hermenegildo based on his September 1998 tongue gesture and, in April 2000, he was convicted of a misdemeanor for, "with offensive and disorderly acts or language[,] accost[ing] or annoy[ing]" Gray at her workplace. M.G.L. ch. 272 § 53 (2000). In October 1999, she brought this diversity action against Genlyte charging it with violation of M.G.L. ch. 151B,

-4-

which inter alia forbids an employer from tolerating sexual harassment in the workplace.

Genlyte's evidence at the subsequent trial did not directly refute Gray's claims as to individual incidents--the company did not call Hermenegildo to testify--but it did raise doubts about Gray's claims on several fronts. On cross examination, Gray acknowledged that she had not reported the 1981 incidents to the company that year and she gave conflicting accounts of whether she had ever reported some of the most serious subsequent conduct (e.g., Hermenegildo grabbing his crotch and making lewd remarks). And Torrence testified that Gray's 1995 complaint was far more limited in scope than she had claimed.

Genlyte also adduced testimony from Gray's own witnesses--a treating social worker and a psychiatrist who testified as an expert for Gray. Based on their testimony, Genlyte asserted that Gray had suffered from emotional, psychological and social difficulties from her childhood onward, that she had personality disorders, and that her reactions to her treatment by Hermenegildo were more extreme than they would otherwise have been.

Finally, Genlyte argued that most of Gray's charges against Hermenegildo were uncorroborated by evidence from others at the plant. Based on its own witness' testimony, the company said that its supervisors had made reasonable and good faith efforts to investigate such complaints as Gray had made to it, handicapped though they were by

her delays and omissions.  On this basis, it argued that even if the harassment alleged had all occurred, the company lacked sufficient notice to make it liable.

For its deliberations, the jury was given a verdict form with six special questions, of which only the first three were eventually answered.  The first three read as follows:

> (1) Was plaintiff, Linda Gray, subjected to sexual harassment, i.e. verbal or physical conduct of a sexual nature?
>
> (2) Was that conduct offensive and/or unwelcome to plaintiff?
>
> (3) Was that conduct sufficiently severe and/or pervasive so as to alter the conditions of plaintiff's employment by creating a work environment that a reasonable person would find intimidating, hostile, humiliating or sexually offensive?

After seven hours of deliberation, the jury submitted the following question:

> We're not going to reach a verdict tonight, as we are 'hung up' on Question 3.  I would not characterize us as deadlocked, but we do need some more time to deliberate.  The wording of Question 3 has us a bit concerned. 'Sufficiently severe' is fairly nebulous, and we are wondering if we could have some clarification.  Thank you very much.

Both sides then submitted suggestions for supplemental jury instructions and the district court met with counsel to discuss them.

After hearing objections by Gray's counsel who had proposed numerous supplemental instructions, the district court delivered a

-6-

single supplemental instruction, telling the jury that as to question (3) it should consider the "totality" of the circumstances over the period in question (including the frequency, severity, and/or offensiveness of the conduct), whether it was physically threatening, whether it would reasonably interfere with a reasonable woman's job performance, and whether it would undermine her ability to succeed at her job.

After further deliberation, the jury returned a verdict in Genlyte's favor. It answered "yes" to questions (1) and (2) but "no" to question (3). Based on the verdict form, a "no" answer to question (3) ended the case in defendant's favor and spared the jury from having to consider the company's knowledge of the harassment, the adequacy of steps taken to prevent it and the amount of damages to be awarded. This appeal followed.

On appeal, five of the eight claims of error advanced by Gray concern the failure to give instructions or errors in the instructions that were given. Such claims are reviewed de novo (e.g., failure to give an instruction) or under an abuse of discretion standard (e.g., court's choice of language). Wilson v. Mar. Overseas Corp., 150 F.3d 1, 10 & n.7 (1st Cir. 1998). However, casting a shadow over Gray's claims is Genlyte's contention that none of the objections to the instructions was adequately preserved, so they are reviewable only for plain error. We agree with Genlyte.

Insofar as the initial instructions are concerned, none of the errors or omissions now objected to was specifically identified by Gray's counsel after the instructions and before the jury first retired, even though the district judge warned that specific objections would be necessary to preserve the objections; the only debatable case is discussed below. As for the requested supplemental instructions, the district court after giving its supplemental instruction asked for objections. Gray's counsel responded, "Just simply the ones I have already stated, your Honor." This is not enough.

The governing rule provides that a party cannot assign as error the giving of or failure to give an instruction "unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51 (emphasis added). "Objection" means to the instruction as given; thus, even if the initial request is made in detail, the party who seeks but did not get the instruction must object again after the instructions are given but before the jury retires for deliberations. Smith v. Mass. Inst. Tech., 877 F.2d 1106, 1109 (1st Cir. 1989). Further, it is not enough for counsel in renewing an objection merely to refer back generically to objections made before the charge.[1]

---

[1]See Davis v. Rennie, 264 F.3d 86, 100 (1st Cir. 2001); Elliot v. S.D. Warren Co., 134 F.3d 1, 5-6 (1st Cir. 1998); see also 9A Wright and Miller, Federal Practice and Procedure § 2553

This may seem harsh, but it accords with the language of Rule 51, which requires that the objection state "distinctly the matter objected to and the grounds of the objection," Fed. R. Civ. P. 51, and we are in any event bound by a long line of precedents. <u>See</u> note 1, above. Further, in many instances, the judge will not know just what it is in the instructions as given that has not satisfied counsel. It is easier to have a flat rule than try to decide case by case when the judge should have been warned more "distinctly" as to the concern, although there will always remain some gray-area cases posing hard questions. <u>See</u> <u>Wilson</u>, 150 F.3d at 7-8.

Despite the unqualified language of Rule 51, this court has allowed appellate review for "plain error" despite the lack of a proper objection, but plain error is "confined to the exceptional case." <u>Toscano</u> v. <u>Chandris, S.A.</u>, 934 F.2d 383, 385 (1st Cir. 1991) (internal quotations omitted). We have followed the Supreme Court's general formulation, first used in criminal cases, requiring the party claiming plain error to demonstrate (1) that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that it was sufficiently fundamental to threaten the fairness or integrity or

_____

at 411-415 (1995) (noting that although some courts will forgive a failure to object after the instruction if the party's position previously had been made clear to the trial judge, this is "risky business" and counsel should renew all objections at the close of the jury charge to properly preserve them).

public reputation of the judicial proceeding.  <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 735-36 (1993).

Of the five omitted instructions, only two come close to being error and neither is "plain" error.  The most difficult one concerns the relationship between sexual harassment and intimidation. In a nutshell, Gray argues that the district court effectively told the jury that it could not consider non-sexual conduct but only conduct that was either explicitly sexual or had "sexual overtones" and that this altered the outcome of the case by excluding merely threatening conduct (<u>e.g.</u>, following Gray home).

Section 151B, like Title VII, <u>see</u> 42 U.S.C. § 2000e-2 (1994), prohibits discrimination based on "sex" regardless of whether it is manifested by conduct that is sexual in character or is wholly non-sexual but is motivated by gender.  <u>See e.g.</u>, <u>Brockton</u> v. <u>MCAD</u>, 386 N.E.2d 1240, 1241 (Mass. 1979) (denial of accrued sick leave benefits for pregnancy-related disabilities); <u>Thurber</u> v. <u>Jack Reilly's, Inc.</u>, 521 F. Supp. 238, 240-41 (D. Mass. 1981), <u>aff'd</u>, 717 F.2d 633 (1983), <u>cert. denied</u>, 466 U.S. 904 (1984) (failure to promote employee because of her sex).  Thus Gray could have charged Genlyte, among other faults, with tolerating <u>intimidation</u> motivated by gender.  But that is not what happened.

The Massachusetts statute, unlike the federal statute, provides explicitly that "[d]iscrimination on the basis of sex shall

include, but not be limited to, sexual harassment" and in the same provision states that the term "sexual harassment" shall mean:

> sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

M.G.L. ch. 151B § 1(18).

Gray's complaint did cite section 151B's discrimination provision at the outset but the rest of the complaint phrased the claim, and did so repeatedly, in terms of "sexual harassment." In other words, Gray narrowed her claim to "sexual harassment" as defined by Massachusetts law. The Massachusetts definition addresses itself to "sexual" advances and requests and to verbal or physical conduct "of a sexual nature." Accordingly there is a literal-language basis for instructing the jury that, in cases where the charge is sexual harassment, all of the conduct used to prove sexual harassment must have some connection to sex.

Still, acts of intimidation could comprise part of a pattern of sexual harassment, even though standing alone such acts might have no sexual connotation. Consider a male employee who made a series of explicit sexual advances to a female co-worker and then, when rebuffed,

-11-

lurked outside the victim's home.  Massachusetts precedent appears to support this common-sense view, see Dahms v. Cognex Corp., 2000 WL 33170952, 12 Mass. L. Rptr. 486 (Mass. Super. 2000) ("Conduct which is not specifically sexual in nature may nevertheless be evidence of . . . hostile work environment sexual harassment.").

In its original instructions to the jury, the district court came close to tracking the statute--and then went a bit beyond in Gray's favor:

> [Sexual harassment] is any conduct of a sexual nature, and it is actionable if it's sufficiently pervasive in the place where it takes place or in the context of wherever it does take place.  It can consist of sexual remarks, of ridicule, of intimidation, but it has to have sexual overtones.

In explaining just how severe the harassment had to be in order to create a hostile work environment, the district court used somewhat similar language, "[D]ecide whether the totality of [Hermenegildo's] conduct was so severe, so pervasive that a reasonable woman would find the work environment to be hostile, humiliating, or intimidating as a result of that conduct."

In this case, some of Hermenegildo's conduct was overtly sexual (remarks, the tongue gestures, crotch grabbing) while other acts (in our view) were implicitly so in the context of the explicit conduct:  staring at Gray, waiting for her in the parking lot, appearing at her work station, following her home.  The jury may well

have taken the district court's reference to "intimidation . . . [having] sexual overtones" to encompass this latter conduct; but perhaps it thought that conduct could count only if in isolation it had "sexual overtones."  No one can be sure.

As to the proper reading of Massachusetts law, our own view is that the SJC would construe the statute in accordance with Dahms so we think that in the future the jury should be told (where pertinent) that acts of intimidation may be part of "sexual harassment" based on context alone.  Still, it is impossible to describe the district court's own "overtones" charge as plain error since it tracks (or is more favorable than) the statute taken literally and there is little direct Massachusetts precedent.  And, since the jury may well have understood the instruction given to encompass all of Hermenegildo's reprehensible conduct, it is even harder to say that the ambiguity likely altered the result.  Olano, 507 U.S. at 734.

Gray's brief makes four other objections to the instructions which are also respectable but in our view less powerful.  We start with the one on which Gray places greatest stress.  Gray says that she asked that the supplemental instruction tell the jury to consider the plight of a reasonable woman "in Gray's position," that the district court failed to include the quoted language, and that consequently the supplemental instruction misled the jury into believing that it should

-13-

consider the experience of women at the plant as a whole rather than Gray's own experience.

The problem arises primarily because the supplemental instruction (which we reprint in full in an attachment) told the jury inter alia that the severity issue "boils down to this":

> Would the mythical reasonable woman that we talked about yesterday, that I described to you yesterday, neither overly sensitive nor overly hardened, would that mythical reasonable woman find the work environment at Lightolier, as it has been described to you in the course of the trial, hostile, humiliating, or intimidating as a result of the sexual harassment that you found had occurred? [emphasis added].

This, coupled with the absence of language focusing the jury on Gray's own experience, could--if taken in isolation--easily have misled the jury into thinking that the severity issue turned on the experience of the average woman in the plant. In fact, there was a limited amount of evidence at trial about the experience of other women.

Nevertheless, we think it highly unlikely that, in the context of the trial as a whole, the jury misunderstood. First, the great bulk of harassment evidence at trial concerned harassment of Gray. Second, in a pre-charge instruction on the third day of trial, the district court told the jury that the key question as to severity was whether the harassment was "hostile or intimidating or humiliating to an objectively reasonable person in the plaintiff's position"--the very words Gray says were required. Third, the closing arguments of

-14-

opposing counsel both focused on the harassment of Gray--not the experience of other women. Finally, the three special questions answered by the jury, reprinted above, focused directly on the harassment to which "Linda Gray" had been subject.[2]

In sum, the supplemental instruction might well be error if taken alone; but in the context of the trial it is doubtful that the jury was misled. In all events, we are confident that the instruction in context does not meet a critical requirement for plain error, namely, that its correction would likely have altered the result. We add that the very ease with which any confusion could have been resolved, and the certainty that the district court failed to appreciate the inference created by the abstract wording of the instruction, underscores the need for counsel to make a <u>distinct</u> objection after the instructions.

Next, Gray argues that Massachusetts case law makes clear that sexual harassment can be based not only on the impact of individual acts taken separately but also on the "cumulative effect" of such acts over a period of time. <u>E.g.</u>, <u>Cuddyer</u> v. <u>Stop & Shop Supermarket Co.</u>, 750 N.E.2d 928, 937 (Mass. 2001). In both the

---

[2]The first question asked: "Was plaintiff, Linda Gray, subject to sexual harassment, i.e., verbal or physical conduct of a sexual nature?" Questions (2) and (3) inquired whether "that conduct" was offensive or unwelcome to plaintiff and whether "that conduct" was sufficiently severe or pervasive to violate the standard described by the court.

original charge and the supplemental charge, the district court asked the jury to consider "the totality of the circumstances over the period of time in question" including its frequency, severity and offensiveness.

We will assume that "totality" might in some situations have a different and less favorable nuance for a plaintiff than "cumulative", although this might be debated and vary from case to case. But while Gray did request the word "accumulated" in her original instruction request and "cumulative" in her supplemental request, in neither case did she specifically call the court's attention to the discrepancy <u>after</u> the charge, which is a perfect illustration of why Rule 51 demands specificity. If there was error, it was neither plain nor prejudicial under <u>Olano</u>.

Next, when the jury returned after its initial deliberation and asked the court to give it further guidance, Gray's counsel asked for an instruction telling the jury that "[c]onduct is sufficiently severe and pervasive if it" met any one of the following rubrics; there then followed a list of eight characterizations, each (with one exception) matched by a citation to a Massachusetts case or MCAD ruling. Two examples suffice: "If it would alter a reasonable woman's work environment" and "If it went beyond the boundaries of typical workplace horseplay."

The district court declined to give this instruction. Instead, the trial judge told the jury to consider whether the reasonable woman would "find the work environment hostile, intimidating or humiliating, as a result of the sexual harassment conduct that had occurred"; and the court then continued, mentioning two of the eight factors that Gray's supplemental instructions had mentioned and describing them as matters to consider rather than as independent bases for liability:

> Now, in making that judgment, consider the totality of the circumstances over the period of time in question, that is, 95, '7 and '8, including the frequency of the conduct, its severity and/or offensiveness, whether it is physically threatening, whether it would unreasonably interfere with a reasonable woman's job performance or whether it would undermine her ability to succeed at her job.

The district court in explaining its refusal to give the supplemental instruction in the form sought by Gray said that the list of slightly different formulations would be more confusing than helpful; and on appeal Genlyte accuses Gray of "nit picking" in pursuing its objection. We do not agree that Gray's request is a minor quibble: instead, we think the requested instruction was flatly wrong and would reject this claim of error even if it had been properly preserved by a post-instruction specific objection, which it was not.

The idea of extracting from state-law cases or MCAD decisions a string of individual sentences and elevating them to independent

-17-

bases for liability has an obvious potential for mischief. Certainly, the full complement of conduct alleged in this case obviously "would alter a reasonable woman's work environment" (or so a jury might find) but that would be true also of much milder misconduct that would not be sufficiently severe and pervasive. Similarly, misconduct could go "beyond the boundaries of typical workplace horseplay" but not amount to sexual harassment.

The real vice of the requested instruction is that it takes out of the context of surrounding facts and legal discussion phrases that were almost certainly not intended as free-standing tests of liability. Admittedly, a couple of the other examples in Gray's laundry list come closer to stating defensible tests, but the district court was not required to pare down a laundry list to the least objectionable quotations. See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 63-64 (1st Cir. 2000). And, of course, even if the list were pristine, the district judge would have been under no obligation to use those particular words. United States v. Destefano, 59 F.3d 1, 2-3 (1st Cir. 1995).

Finally, so far as instructions are concerned, Gray complains that the district court failed to correct a misstatement of law by Genlyte's counsel made in closing argument. Genlyte's counsel said the following in the course of closing argument:

> [T]he biggest hurdle she's got to get over is convincing you that a reasonable woman working

-18-

out in that Lightolier plant at the time would have felt that the conduct that she told us about was sufficient--was sufficiently severe and pervasive as to create a sexual hostile working environment.

Obviously, the phrase "that she told us about" ("us" meaning Genlyte) was inaccurate. If Genlyte had not known and had no reason to know that one non-supervisory employee was harassing another, it would not be responsible, cf. College-Town Div. of Interco, Inc. v. MCAD, 508 N.E.2d 587, 591-93 (Mass. 1987); Meritor Savings Bank v. Vinson, 477 U.S. 57, 72 (1986).[3] However, at trial Gray was not limited to proving only episodes about which she had specifically complained to her employer.[4] Of course, Genlyte was entitled to argue, as it did, that the failure to report episodes cast doubt on Gray's credibility, but the quoted statement of defense counsel went too far, as Genlyte's brief more or less concedes.

---

[3]Under section 151B an employer is, however, liable for harassing conduct by its supervisors even if that conduct was not reported. College-Town, 508 N.E.2d at 592-94; see also Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)(under Title VII an employer is vicariously liable for discriminating conduct by a supervisor subject to an affirmative defense).

[4]Once Genlyte was on notice and failed to act, it could easily become responsible for later harassment not specifically reported to it. See College-Town, 508 N.E.2d at 593. And in some situations pre-notice harassment might be relevant to the severity/pervasiveness issue even though not itself a basis for damages. See Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62-63 (2d Cir. 1998). Cf. Cuddyer, 750 N.E.2d at 541-42 (harassment not timely reported to MCAD can be considered as evidence of hostile work environment even though not a basis for damages).

The problem is that Gray's counsel did not complain about the statement after the closing arguments or in connection with the initial instructions. Instead, after the instructions were given, Gray's counsel listed various specific objections and then ended by saying: "There was a misstatement of the law by the opposing counsel." The district judge said that she thought she had been even-handed and then went on to another topic. Gray's counsel could have but failed to identify the misstatement, and the district judge probably never knew what counsel was complaining about.

When the jury came back requesting further instructions on the severity issue, Gray's counsel for the first time did ask the court to instruct the jury that it should consider not only the actions for which Gray had made a timely and adequate complaint but "all actions she suffered." Before the supplemental instruction was given, Gray's counsel sought to elaborate on this point, but the colloquy bogged down in a misunderstanding as to whether Gray was complaining about what Genlyte's counsel had said or claiming that the affirmative instructions by the court were mistaken. In any event, the judge gave no further instruction on this issue and, as already noted, Gray's counsel failed to object after the supplemental instruction with the precision needed to preserve the point.

The question remains whether the failure to correct the misstatement of Genlyte's counsel was plain error. The difficulty for

Gray is that the district court's own instructions, including its reference to "totality of the circumstances," left the jury free to consider episodes that were not specifically reported.[5] Thus, it is virtually impossible to find that the district court's failure to correct a four-word qualifying phrase, used in a single sentence of defense counsel's lengthy closing argument, was likely to have altered the outcome of the case. This is alone enough under Olano to derail the claim of error.

Turning from jury instructions to rulings on evidence, Gray says that the district court erred in three instances by excluding relevant testimony. Not all rulings on evidence are reviewed solely for abuse of discretion; an evidence ruling could present a pure legal issue requiring us to construe a Federal Rule of Evidence. Olsen v. Correiro, 189 F.3d 52, 58 (1st Cir. 1999). But all three rulings here are judgment calls, balancing considerations of relevance and prejudice, where deference to the district court's on-the-spot judgment is substantial. Fitzgerald v. Expressway Sewerage Constr., Inc., 177 F.3d 71, 75 (1st Cir. 1999); Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987). We turn to those claims.

---

[5]The district court did say that conduct that occurred before the company was on notice could not be included in calculating damages, but Gray makes no objection to this proposition which is addressed to causation. College-Town, 508 N.E.2d at 591-93; cf. Cuddyer, 750 N.E.2d at 541-42. In fact, Gray essentially requested this instruction in her original proposed jury instructions.

First, Gray claims that she should have been able to testify that in 1996, a co-worker told her that Hermenegildo had physically assaulted his wife so seriously that his wife had required emergency medical treatment. Gray's theory was that, true or false, this report greatly enhanced her own fear of Hermenegildo and explained why her emotional reactions to the later acts of alleged harassment were so severe. The district court did allow Gray to testify that she was told <u>something</u> by the coworker that greatly enhanced her fear of Hermenegildo, but the court forbad a reference to the physical assault as unduly prejudicial. Fed. R. Evid. 403.

The district court was perfectly entitled to be concerned that a specific reference to the report of an assault would be considered for its truth and would improperly prejudice the jury. The compromise reached by the district court was a perfect example of a reasonable call that is not an abuse of discretion. As it happens, Gray's counsel in closing argument did refer specifically to the physical assault, although the company's counsel objected and the judge--without telling the jury to disregard the remark-- told Gray's counsel to move on in his closing argument.

Second, Gray claims that she should have been permitted to offer evidence of Hermenegildo's April 2000 misdemeanor conviction for "accosting" Gray. Massachusetts law defines the offense to include the use of "offensive and disorderly acts or language [to] accost or annoy

-22-

persons of the opposite sex . . . ." M.G.L. ch. 272 § 53. The act was the tongue gesture that Hermenegildo had made at Gray in September 1998, after Gray testified at her August 1998 worker's compensation hearing. Gray argued that she was entitled to offer the conviction to refute the company's position that Hermenegildo's behavior was no more than childish or adolescent behavior and was not sexual harassment.

The district court was well within its discretion to exclude the evidence of the fact of conviction. See Gil de Rebollo v. Miami Heat Ass'ns, Inc., 137 F.3d 56, 64 (1st Cir. 1998). The criminal conviction was certainly "relevant" in the sense that it reflected social judgment, both in the statute and the conviction, that Hermenegildo's conduct was criminally blameworthy, and this would rationally have some bearing on whether the conduct was also sufficiently serious to constitute severe harassment. The conviction would also have served to counter the "childishness" label offered by the defense.

Nevertheless, there is an obvious potential for confusion and unfair prejudice, Fed. R. Civ. P. 403, since the sexual harassment standard and the accosting statute involve two different tests and, taken literally, the accosting statute would embrace conduct so mild ("offensive and disorderly acts or language [,] accost[ing] or annoy[ing]" the victim) that it is easy to imagine violations of the statute that would not constitute serious harassment. Gil de Rebollo

makes clear that judgments under Rule 403 are primarily the province of trial judges in particular, and that admission of evidence of this kind is likely to depend on a discretionary judgment.  137 F.3d at 64.

Third, Gray asserts that the district court erred in excluding the testimony of her co-worker, Ray Tisdale, concerning Hermenegildo's September 1998 conduct following Gray's worker's compensation hearing.  He would have testified (1) that in response to Tisdale's testimony against Hermenegildo, the latter harassed Tisdale by making a punching motion with his fist and "giving him the finger"; (2) that he (Tisdale) filed a complaint and Hermenegildo in some degree admitted misbehavior; and (3) that despite these facts, the company did nothing about Tisdale's complaint.  Gray argued that Hermenegildo's acts themselves intimidated her and that the company's failure to act reinforced her view that the environment in which she worked was unprotected.

Genlyte moved to bar evidence of the episode as bearing solely on Hermenegildo's propensity for violence and sexually offensive conduct--which is a rational but forbidden inference.  See Fed. R. Evid. 404(a). Gray's most plausible counters--to show other uses of the evidence, see Fed. R. Evid. 404(b)--were that the company's failure to respond confirmed its indifference to complaints and that Hermenegildo's quasi-admissions to the company (e.g., that his alleged threatening gesture to Tisdale was only scratching his nose) were so

-24-

incredible as to undermine the company's reasonable belief in any of Hermenegildo's denials.

At trial, the district court without further discussion excluded testimony from Tisdale but later allowed in a company memorandum, setting forth Tisdale's allegations and Hermenegildo's unpersuasive response, for the limited purpose of showing that the company had received this information. In closing, Gray's counsel relied on this episode and asserted as a matter of fact that the company had ignored the Tisdale complaint and Hermenegildo's response to it. Thus, despite the court's rulings, Gray got in the gist of the evidence.

Even if the evidence had been excluded in full, we would not reverse the district judge. It was principally, and powerfully, relevant as propensity evidence--which was the forbidden use. But, involving conduct directed at a different party, it was only of limited relevance as to whether the company failed to respond to Gray's complaints or unduly credited other denials by Hermenegildo. Given its limited relevance and the potential for misuse as propensity evidence, exclusion was a call within the district court's discretion. United States v. Gonsalves, 668 F.2d 73, 75 (1st Cir. 1982).

This exhausts Gray's claims of error, but something more must be said. If Gray's version of events were taken at face value, it would be hard to understand the jury's finding that severe sexual

harassment had not been proved.  The jury was entitled to discount Gray's testimony; credibility is preeminently a jury matter and Gray's credibility was attacked.   Yet, on a cold (and incompletely transcribed) record, we still think the outcome on question (3) surprising, even allowing for what seems to have been a skillful defense.

Genlyte may have no further legal obligation to Gray, but it ought carefully to ponder its moral obligation to assist her recovery and reemployment.  Even if various of Hermenegildo's acts were unknown to the company or some did not occur at all, Gray was manifestly mistreated by Hermenegildo on the job and suffered badly as a result. If an employer's sense of humanity is limited to what the law demands, it will find to its regret that the law will demand more and more.

The judgment is <u>affirmed</u>. Each side shall bear its own costs on this appeal.

<u>It is so ordered</u>.

Members of the jury, you left me yesterday with a question, as follows:

"We are not" -- "We're not going to reach a verdict tonight, as we are 'hung up' on Question 3.  I would not characterize us as deadlocked, but we do need some more time to deliberate.

"The wording of Question 3 has us a bit concerned. 'Sufficiently severe' is fairly nebulous, and we are wondering if we could have some clarification.

"Thank you very much."

Well, you're right, it is nebulous.  And here is what I hope will clarify the situation for you.

The question, Question 3 really boils down to this:

Would the mythical reasonable woman that we talked about yesterday, that I described to you yesterday, neither overly sensitive nor overly hardened, would that mythical reasonable woman find the work environment at Lightolier, as it has been described to you in the course of the trial, hostile, humiliating, or intimidating as a result of the sexual harassment that you found had occurred?

You have now found it occurred, because you have clearly answered yes to Questions 1 and 2.

So, it boils down to that: Would a reasonable woman find the work environment hostile, intimidating, or humiliating, as a result of the sexual harassment conduct that had occurred?

Now, in making that judgment, consider the totality of the circumstances over the period of time in question, that is, '95, '7 and '8, including the frequency of the conduct, its severity and/or offensiveness, whether it is physically threatening, whether it would unreasonably interfere with a reasonable woman's job performance, or whether it would undermine her ability to succeed at her job.

Now, note that frequency and severity sort of go together, that is, fewer truly gross incidents may be sufficient, as may be a whole string more less [sic] offensive ones. In the end, it is your judgment in balancing the totality of what occurred.