# United States Court of Appeals
## For the First Circuit

No. 02-1419

SHARON PRIMUS,

Plaintiff, Appellee,

v.

RICHARD C. GALGANO,

Defendant, Appellant.

APPEAL FROM THE U.S. DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

Robert F. Oberkoetter, with whom Rosario M.F. Rizzo was on brief, for appellee.

Wilson D. Rogers III, with whom Wilson D. Rogers, Jr., Mark C. Rogers, Lori M. Nehls, and The Rogers Law Firm P.C. were on brief, for appellant.

May 21, 2003

**LYNCH**, **Circuit Judge**.  A jury returned a verdict of $1,460,000 against Dr. Richard Galgano for medical malpractice in his 1993 treatment of Sharon Primus, who was later diagnosed with breast cancer in 1995.  On appeal, the doctor raises two issues.  He argues the evidence was insufficient to show his failure to meet the appropriate standards of care and causation.  He also argues the district court committed error in failing to instruct the jury under Mass. Gen. Laws Ann. ch. 231, § 60H (West 2003) and that the verdict should be reduced to the $500,000 cap under that statute.  We affirm.  In doing so, we hold, in an issue of first impression, that a defendant must request an instruction under Mass. Gen. Laws Ann. ch. 231, § 60H and waives his claim if he does not do so.

I.

Sharon Primus, whose husband is in the military, saw a number of physicians at Luke Air Force Base in Arizona between 1989 and 1992 regarding a cyst (or cysts) in her breast.

On October 18, 1989, Primus saw Dr. Susan Allen, a specialist in family medicine at Luke Air Force Base, for a routine annual examination.  Dr. Allen palpated a 2 millimeter lump in Primus's breast.  According to Primus's medical records, the lump was located in her left breast; Primus, however, maintains that this is a mistake and that the lump was in her right breast.  Dr. Allen ordered a mammogram be performed on Primus the next day.  Dr. Allen also referred Primus to Dr. Lawrence Riddles, a surgeon at

-2-

Luke Air Force Base; Dr. Allen noted in Primus's record that she should be evaluated by a surgeon, and a biopsy should perhaps be performed. Dr. Riddles saw Primus on November 1, 1989. Based on his examination and the mammogram ordered by Dr. Allen, he concluded that there was no evidence of cancer. Dr. Riddles also recommended that Primus return for a follow-up visit in three months' time; Primus did not see Dr. Riddles again, however. Primus did see Dr. Allen in November 1990. At that time, Dr. Allen found no mass in Primus's breast. No biopsy was performed despite Dr. Allen's query.

On July 19, 1991, Primus saw another surgeon at Luke Air Force Base, Dr. Earl Walker. This time, Primus went directly to a surgeon, rather than being referred by a general practitioner. According to Dr. Walker's notes, Primus complained of a month-old cyst in her right breast. Palpation revealed a 4 millimeter cyst in her right breast. Dr. Walker made a preliminary diagnosis of fibrocystic disease, and ordered a mammogram. The mammogram was performed on July 25, 1991, and Primus saw Dr. Walker to discuss it on August 8, 1991. Dr. Walker again diagnosed the lump as fibrocystic disease, noting that it was a 6 millimeter smooth lump. Primus saw Dr. Walker for a third time in January 1992. He noted a 4 to 6 millimeter lump, palpated her lymph nodes, and recommended that she come back in July 1992 for another mammogram. Primus did not have a third mammogram while at Luke Air Force Base.

-3-

Primus also saw Dr. Allen for another annual physical examination on December 18, 1991, and complained of a cyst in her right breast. Dr. Allen noted that Primus should follow up with a surgeon, and perhaps a needle aspiration or surgical biopsy could be performed. Again, no biopsy or needle aspiration was performed, nor were such diagnostic procedures ever performed while Primus was in Arizona. Primus also saw a nurse at Luke Air Force Base, Diane Musselwhite, in June 1992. Nurse Musselwhite noted that Primus had a 10 millimeter lump in her breast.[1]

Primus left Arizona in July 1992, and relocated with her family to Massachusetts when her husband was transferred to Hanscom Air Force Base. She became pregnant in August 1992. During Primus's pregnancy, changes in her breast were attributed to normal effects of pregnancy. Primus saw Dr. Martin Gross, an obstetrician, on October 15, 1992. At that time, a hardened area was detected in Primus's right breast. In November 1992, Primus saw Dr. Michael Shaw, a hematologist/oncologist, who recorded that Primus had "normal pregnant breasts." Dr. Gross also did an evaluation of Primus's breasts when he delivered her child in April 1993, and found no mass in her breast.

---

[1] Primus's expert witness, Dr. Mary Jane Houlihan, identified Nurse Musselwhite as the author of a note in Primus's record which recommended that Primus see a surgeon regarding the breast lump. It is unclear if Nurse Musselwhite wrote this note, or if this resulted from a confusion on Dr. Houlihan's part between Primus's June 1992 visit with Musselwhite, and her December 1991 visit with Dr. Allen.

On October 12, 1993, after the birth of Primus's son, Primus saw Dr. Richard Galgano, a private primary-care physician who saw patients from Hanscom Air Force Base, for a complete medical examination.  Galgano palpated a lump and noted in her record a cyst in the outer portion of her right breast.  Primus told Galgano that a lump in that breast had been diagnosed as non-cancerous by doctors in Arizona after a 1991 mammogram.  She also told him it had not changed in size since then, and that it was not painful.  Though he palpated the lump, Galgano did not refer her to a surgeon, nor did he obtain her medical records or perform a work-up.

Primus was diagnosed with breast cancer in 1995.  On March 14, 1995, she consulted a general practitioner, Dr. Daniel Melville, who, after palpating a lump in her right breast, immediately arranged for both a mammogram and an ultrasound.  Primus had a mammogram, but the ultrasound was not performed at the recommendation of the radiologist, who felt that the mammogram alone clearly indicated the presence of cancer.  Dr. Melville called Primus at home the evening of the day she had her mammogram to tell her she needed to see a surgeon as soon as possible.  Primus saw the surgeon, Dr. Kevin O'Donnell, the next day, March 29, 1995.  Dr. O'Donnell diagnosed breast cancer on the basis of the mammogram and palpation of the lump.  He ordered a biopsy on April 11, 1995 to confirm his diagnosis, and then scheduled surgery

for Primus shortly thereafter. By that time, the cancer had metastasized into four lymph nodes. The lump was estimated to be 40 millimeters in size, but the final pathology report recorded it as 25 millimeters. She underwent a radical mastectomy on May 12, 1995 that entailed removal of her entire breast and 21 lymph nodes and began chemotherapy in June 1991. After the mastectomy, breast reconstruction was attempted unsuccessfully. At trial, Primus and her husband testified about the pain, suffering, and embarrassment which had resulted from the loss of her right breast, the chemotherapy, and the failed reconstructive surgery.

## II.

On March 27, 1998 Primus filed a medical malpractice action in the U.S. District Court in Massachusetts. It was consolidated for the purpose of discovery and trial with another case arising out of overlapping facts, which had originally been filed in U.S. District Court in Arizona in July 1998. Primus v. United States, C.A. No. 99-10151-RGS. The Arizona case alleged a cause of action against the United States for medical negligence by Dr. Walker under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 (2000). Because FTCA claims are heard by a judge rather than a jury, see 28 U.S.C. § 2402, the instant case was tried to a jury, while the case against the United States was tried by the district court. For this reason, some evidence was presented to the judge out of the presence of the jury. The

district court instructed the jury that it was only to consider the claims against Dr. Galgano, not those against Dr. Walker. The FTCA case was governed by Arizona law, while the instant case was tried under Massachusetts law.

The defendant filed a motion for Judgment as a Matter of Law, Fed. R. Civ. P. 50(a), at the close of plaintiff's case, and renewed the motion at the close of all the evidence. Both motions were denied. The jury returned a verdict for the plaintiff consisting of $500,000 for damages suffered as a result of negligence, and $960,000 for future pain and suffering. Defendant then filed a motion for entry of judgment, styling it as being in accordance with Mass. Gen. Laws Ann. ch. 231, § 60H, and requesting that the district court reduce the verdict to $500,000 as an operation of law. Defendant also filed a motion for judgment in accordance with Fed. R. Civ. P. 50(b), arguing that plaintiff had failed to present evidence demonstrating deviation from the accepted standard of care or that that deviation was causally related to plaintiff's injury. Both motions were also denied. Primus v. Galgano, 187 F. Supp. 2d 1 (D. Mass. 2002).

The defendant now appeals these rulings, arguing that the plaintiff failed to introduce expert testimony evidence demonstrating deviation from the accepted standard of care and a causal relationship between that deviation and plaintiff's injury,

and that the verdict must be reduced to $500,000 as an operation of law.

### III.  Sufficiency of the Evidence

Dr. Galgano argues Primus did not produce expert evidence that he deviated from the expected standard of care or that the alleged deviation was causally related to any injury, including a diminished chance of survival or longer life.  To prevail on a negligence claim under Massachusetts law, "a plaintiff must show by a preponderance of the evidence '(1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury.'" Heinrich v. Sweet, 308 F.3d 48, 62-63 (1st Cir. 2002) (quoting Jorgensen v. Mass. Port Auth., 905 F.2d 515, 522 (1st Cir. 1990)).

Under Massachusetts law, the rule in medical malpractice cases against physicians is:

> [W]hether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession.  In applying this standard it is permissible to consider the medical resources available to the physician as one circumstance in determining the skill and care required.  Under this standard some allowance is thus made for the type of community in which the physician carries on his practice.

Brune v. Belinkoff, 235 N.E.2d 793, 798 (Mass. 1968).  The plaintiff must present expert testimony as to the standard of care and its breach, unless the breach is sufficiently obvious as to lie within the common knowledge of the jury.  Heinrich, 308 F.3d at 63

(quoting Haggerty v. McCarthy, 181 N.E.2d 562, 565-66 (Mass. 1962)).

Evidence of a causal connection between the negligence of the defendant and damages suffered generally must be established by expert testimony that the injury sustained was more probably than not a result of the doctor's negligence. Glicklich v. Spievack, 452 N.E.2d 287, 290 (Mass. App. Ct. 1983). Where the question is, as here, whether

> a physician's negligent conduct has caused a delay in the diagnosis of patient's cancer, proximate causation can be proved by expert evidence which shows, to a reasonable medical certainty, that the patient 'would have had a much improved chance of survival or longer life if diagnosis and treatment meeting accepted standards of care had been appropriately initiated.'

Joudrey v. Nashoba Cmty. Hosp., Inc., 592 N.E.2d 769, 772 (Mass. App. Ct. 1992) (quoting Cusher v. Turner, 495 N.E.2d 311, 315 (Mass. App. Ct. 1986)). "Precise evidence" as to "when the cancer began or precisely when or how quickly it metastasized or changed" is not required under Massachusetts law. Cusher, 495 N.E.2d at 315; see Glicklich, 452 N.E.2d at 291-92. All that is needed is testimony to a reasonable medical certainty that, absent the defendant's negligence, the plaintiff would not have had a metastasis of the cancer and would have had a much improved chance of survival or longer life.

"[O]ur review is weighted toward preservation of the jury verdict," even though we review de novo a district court's denial

of a Rule 50 motion for judgment as a matter of law.  Heinrich, 308 F.3d at 59-60 (quoting Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002)).  A jury verdict stands unless "the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them." Walton v. Nalco Chem. Co., 272 F.3d 13, 23 (1st Cir. 2001) (internal quotation omitted).

At core, Dr. Galgano's argument is that most of plaintiff's expert evidence was directed at the negligence of Dr. Walker in 1991 and 1992, and the evidence as to Dr. Galgano on both standard of care and causation was simply insufficient.  He also argues that the plaintiff's expert in later testimony changed her mind as to whether Dr. Galgano had committed malpractice.  The plaintiff had one expert witness, Dr. Mary Jane Houlihan, formerly the director of the Breast Care Program of Beth Israel Hospital in Boston.  This was her first expert testimony on behalf of a plaintiff; previously she had only testified on behalf of defendants.  The plaintiff also relies on Dr. Galgano's testimony on cross-examination to show that she met her burden.

Dr. Houlihan testified on direct examination that in her view Dr. Walker, the treating physician in 1991 and early 1992, had deviated from the requisite standard of care.  By contrast, she gave a less direct answer as to Dr. Galgano, but she concluded with:

Well, what I was getting at was that I'm not sure whether he had the records that day, because it's difficult sometimes to get them, and he noted this and did nothing further.

I would -- my opinion is that this was not necessarily a gross deviation from the standard of care but a deviation from the standard of care in that getting the records he would have seen that this had increased in size --

. . .

-- or he could have referred her to a surgeon for further evaluation.

But I feel that most of what had occurred had already happened, is what I am trying to say, that it had not been worked up in '91 and '92.

She also noted that the size of the lump had increased from 4 to 6 millimeters in 1991 to 25 millimeters in 1995. When Primus had the radical mastectomy in 1995, breast tissue and 21 lymph nodes were removed. Four of the nodes had cancer.

Dr. Houlihan opined that the 4 to 6 millimeter mass described by Dr. Walker in 1991 (and, by implication, by Dr. Galgano in 1993) was the same mass removed in 1995.[2] The cancer was removed from the same site as the lump noticed in 1991 and 1993. Dr. Galgano's counsel conceded at oral argument that it was the same lump in 1991, 1993 and 1995. It was Dr. Houlihan's opinion that after Primus's surgery in 1995, Primus had "about a fifty percent chance of having a recurrence and going on and dying

_____

[2]    The breast surgeon who removed the lump testified at deposition that he could not say with a reasonable degree of medical certainty from the pathology of the lump that the cancer he excised was the same as the lump identified in 1991.

from it." Had the cancer been diagnosed in 1991 or 1992 and treated, Primus would have had a close to normal life expectancy.

On cross-examination, Dr. Houlihan was told of the statements Primus had made about her medical history to Dr. Galgano. The Court then asked:

> I just want to be clear. When you say Dr. Galgano deviated from a duty of care, you say that he did so in failing to follow up on obtaining the prior medical records that had been assembled in Arizona?
>
> THE WITNESS: That was my -- yes. That was my concern, if either identifying -- once this mass had been identified by him, I think -- my opinion is that it would have been helpful either to have had the medical record or, if that wasn't available, to have this looked at by a surgeon to determine whether anything else needed to be done at this point.
>
> THE COURT: Does any of the information Mr. Rogers brought out that you didn't have access to change your mind in any sense about the opinion?
>
> THE WITNESS: Well, it comes back to what I was trying to say earlier, which is that I think that it would change my mind somewhat.
> But I also think that, again, there -- there still hadn't been any test done to prove what this thing was that had been there, presumably, you know, since 1991, never an ultrasound, never a needle placed in it to know exactly what it was.
> That's what I was trying to say.

On redirect, Dr. Houlihan was asked to return to the question of whether her mind had been changed by learning that Primus gave a detailed history to Dr. Galgano:

> Q. And do you recall the judge posing questions about whether or not, knowing now -- or learning today through Mr. Rogers' cross-examination, whether your mind had changed, and you answered in the affirmative; correct?

-12-

A.  That's correct.

Q.  All right.  Did your new knowledge of Ms. Primus having given her detailed history to Dr. Galgano alter your opinion in any way as to whether his conduct deviated from the standard of care of a primary physician?

A.  It did.

Q.  Tell me.

A. I think, if there was that much discussion about the breast issue, it would have -- it's helpful to hear this from the patient, but I would have been -- I would have really felt then that the primary care physician should have obtained the old records and referred . . .  the patient for evaluation by a breast surgeon.

She then was even more explicit.

Q.  Doctor, there is the key fact that Sharon Primus informed Dr. Galgano about, and that was that after her pregnancy the lump remained.  Isn't that a fact?  That when she saw Dr. Galgano, she talked about that lump, and he, in fact, documented it.  Isn't that right?

A.  I've only heard that here today.

Q.  All right.  Now, so, he should have gotten those records?

A.  Yes.

Q.  And he should have immediately referred his patient to a surgeon?

A.  Yes.

Q.  And not having the records, should have undertaken a de novo workup, just the way you've just indicated?

A.  Should have referred her to a surgeon.

-13-

This was the essential testimony on breach of the standard of care. Dr. Houlihan testified that had Dr. Galgano reviewed Primus's medical records he would have learned two things: that there was a mass that had gradually grown in size in the right breast and a recommendation, either by Dr. Allen in December 1991 or by Nurse Musselwhite in June 1992, that Primus be seen by a breast surgeon; and, second, that neither an ultrasound nor a cyst aspiration had been undertaken. This information would have led a competent physician to make a referral to a surgeon.

Dr. Galgano, on cross-examination, confirmed that, if he had had the information contained in Primus's medical records, he would have recommended a different plan. He conceded that if he had known that there was a progression in the size of the lump he "would have referred her to the surgeons." He also said that if he had been aware that Primus had not had the July 1992 follow-up mammogram as recommended by Dr. Walker, that knowledge would have shaped his response.[3] All of this information would have been available to him had he obtained Primus's records from nearby Hanscom Air Force Base.

Dr. Galgano's defense as to standard of care was basically that he was entitled to rely on Primus's own statements as to her medical history. Primus had reported that she had had a

---

[3] She was moving with her family to the Boston area at the time of the recommended mammogram.

lump for several years in the upper outer quadrant of her right breast, that a breast cyst had been diagnosed earlier not to be cancerous, that her mammograms were normal, that there was no maternal family history of breast cancer, and that the lump had not grown in size and did not cause pain.  Dr. Galgano also testified that when he palpated the lump, he concluded that the mass was a cyst, and that Primus's age (31) was not a risk factor.  Dr. Galgano stated that he did not secure Primus's medical records because "Mrs. Primus gave a very good medical history that answered all the questions we needed to continue management at that time."

Dr. Galgano offered an expert witness, Dr. Jerry Blaine, an internist at the Lahey Clinic, who testified that Dr. Galgano complied completely with the standard of care at all times, that Dr. Galgano had no obligation to obtain Primus's medical records, and that Primus did not have breast cancer in 1993.[4]

The jury had two competing versions as to whether there was a violation of the standard of care.  On plaintiff's version, the 18 months from the time she saw Dr. Galgano in October 1993 until her March 1995 visit to Dr. Melville were a period of missed opportunity for diagnosis.  Primus does not indicate precisely when the cancer began (although it can be inferred from her suit against Dr. Walker that she believes the cancer was present as early as

---

[4]  Dr. Blaine acknowledged that, unlike Dr. Houlihan, he was not a cancer expert.

1991), but argues that Dr. Galgano should have acquired her medical records or treated her as though she were a new patient absent those records. She should have been referred to a breast surgeon and the cancer would have been discovered in 1993. On the defendant's version, Dr. Galgano was entitled to rely on the patient's self-reported history, and his own examination showed nothing more than a cyst, so there was no basis for a referral. Further, through the expert testimony presented by Dr. Blaine, defendant suggests that the cancerous tumor excised in 1995 was not the same as the cyst, but instead emerged rapidly between 1993 and 1995.

There appear to be two prongs to Dr. Galgano's lack of causation defense: that there was no causation because what was removed in 1995 was a fast-growing tumor that began after 1993; and that even if the tumor were the same lump felt in 1993 and cancerous then, there was no evidence of harm to plaintiff.

The second defense is easily dispatched. As to causation, Dr. Houlihan testified that if Primus had been diagnosed with cancer in 1992, she would have a non-recurrence prognosis of greater than 95 per cent; that the prognosis when Dr. Galgano saw her was down to 80 to 90 per cent; and that by 1995, it had further decreased to 50 per cent.

Dr. Galgano's first defense as to causation was that this was a very fast-growing tumor: the pathology report found it was a

"three" out of a scale of three.  As to the fast-growing tumor theory, Dr. Houlihan was also cross-examined about whether the tumor removed in 1995 was the same lump seen earlier:

> Q.  And you have no pathological or other studies that would tell you to reasonable degree of medical certainty that the mass that he palpated was, in fact, the cancer that was removed in March of 1995; isn't that correct?
>
> A.  That's correct.
>
> Q.  This is your assumption, not something that you base on any science; is that correct?
>
> A.  That's correct.
>
> Q.  Now, in fact, tumors have objective markers that doctors study in order to determine what kind of tumor is in a patient once the cancer is removed from the patient; isn't that correct?
>
> A.  That's correct.

Dr. Houlihan testified, essentially, that one cannot work backward from the tumor itself to know how long it was there.  She based her testimony on the theory that the tumor was the same as the lump in 1991 because a mass was "present in 1991 that wasn't worked up, and it persisted, and that this was where she ultimately had a cancer." Massachusetts law has upheld jury verdicts on very similar facts in Cusher and Glicklich.  In those cases, the fact that plaintiffs' experts could not establish when the cancer began and how fast it metastasized or changed did not undercut a causation finding based on other expert testimony.  See Cusher, 495 N.E.2d at 315; see also Glicklich, 452 N.E.2d at 291-92.

-17-

The jury could easily have credited Dr. Galgano's version, but it did not. It credited Primus's version, and its verdict was reasonably based on the evidence. This is not a case like Heinrich in which an improper standard of care question was asked and there was a paucity of proper expert evidence on the key questions. See Heinrich, 308 F.3d at 48. We reject defendant's argument.

### IV. Mass. Gen. Laws Ann. ch. 231, § 60H

Defendant asks us to reduce the jury's verdict to $500,000 in accordance with Mass. Gen. Laws Ann. ch. 231, § 60H. After the verdict, defendant filed a Motion for Entry of Judgment, arguing that Massachusetts law dictated a cap on pain and suffering damages of $500,000 applicable in this case. The district court denied the motion. Primus, 187 F. Supp. 2d at 2. The district court did not specify under which Federal Rule of Civil Procedure it considered the motion to have been brought.[5] Depending on which rule is considered relevant, our standard of review might well vary. Compare Perez v. Volvo Car Corp., 247 F.3d 303, 318-19 (1st Cir. 2001) (review of denial of Rule 59(e) motion for altering or amending judgment typically under abuse of discretion, but errors of law subject to de novo review), with Davis v. Rennie, 264 F.3d

---

[5] The defendant purported to bring this motion under Fed. R. Civ. P. 50(b). Rule 50(b), however, was unavailable since the defendant had not raised the § 60H issue at the close of evidence. See Fed. R. Civ. P. 50(b) ("The movant may renew its request for judgment . . . .") (emphasis added).

86, 100 (1st Cir. 2001) (plain error review for limited exceptions when appellant fails to adhere to Rule 51's demand that objections to jury instructions be made before the jury retires).  Whatever the appropriate characterization and standard of review, there was no error here.

Section 60H was enacted in 1986 as part of a series of measures responding to a state crisis in medical insurance and care as a result of malpractice suits.  See Note, The Constitutionality of the Massachusetts Medical Malpractice Pain and Suffering Cap, 29 B.C. L. Rev. 659, 666-71 (1988).  The section was intended to limit noneconomic damages, i.e., pain and suffering and other emotional damages, in order to "decrease[] expenses and stabilize medical malpractice insurance premiums."  Id.  Entitled "Limitation of damages for pain and suffering," § 60H provides:

> In any action for malpractice, negligence, error, omission, mistake or the unauthorized rendering of professional services, . . . the court shall instruct the jury that in the event they find the defendant liable, they shall not award the plaintiff more than five hundred thousand dollars for pain and suffering, loss of companionship, embarrassment, and other items of general damages unless the jury determines that there is a substantial or permanent loss or impairment of a bodily function or substantial disfigurement, or other special circumstances in the case which warrant a finding that the imposition of such a limitation would deprive the plaintiff of just compensation for the injuries sustained.

Mass. Gen. Laws Ann. ch. 231, § 60H.  The cap makes exceptions where there is 1) a substantial or permanent loss of function, 2) a substantial disfigurement, or 3) other special circumstances.

-19-

The defendant draws several conclusions from the language of § 60H. First, the defendant argues, because § 60H uses the words "shall instruct," the trial court was mandated to give the instruction, regardless of whether counsel requested it. Second, the defendant reads § 60H as a cap on damages that applies even when the instruction was not given: the trial judge <u>must</u> reduce pain and suffering damages to $500,000 <u>unless</u> one of the exceptions applies. Applying these arguments to the facts of this case, the defendant maintains that the district court made a finding that none of the exceptions were present, and that the cap had to apply as a result. The defendant argues that there was no waiver on his part because of the district court's statement that it doubted that § 60H applied because there was no factual support for a jury finding of permanent disablement. That statement was not, however, a finding that no statutory exception to the cap was met.

The first two conclusions drawn by the defendant are issues of law as to interpretation of § 60H. We reject the defendant's interpretation of § 60H as requiring a reduction in damages regardless of whether the defendant requests an instruction or not. If the defendant wants to take advantage of the protections of § 60H, he must ask for an appropriate instruction. Under <u>Gray</u> v. <u>Genlyte Group, Inc.</u>, 289 F.3d 128 (1st Cir. 2002), a defendant who does not request a jury instruction is deemed to have waived it. <u>Id.</u> at 133-34. There is no basis in the statute for a

-20-

district court to itself reduce the damages award in the absence of a requested instruction. The statute is phrased in terms of an instruction to the jury.

Here, defendant suggests that his failure to ask for the § 60H instruction is excused by the district court's supposed factual finding. This argument is contradicted, however, by the behavior of defense counsel prior to the delivery of the jury instructions. Defense counsel repeatedly rejected opportunities to request a § 60H instruction, even when the district court essentially invited him to do so. Defense counsel did not request the instructions initially. Then, at a conference to review the instructions, the court itself raised the possibility of delivering a § 60H instruction, but defense counsel did not respond. Finally, after the instructions were delivered but before the jury retired, defense counsel informed the district court that "[t]he defendant is content" with regard to the instructions.

Defense counsel's avoidance of the instructions appears to reflect a strategic decision on the defendant's part <u>not</u> to request the instructions. As affidavits by malpractice defense lawyers and the district court's own experience attest, judges in malpractice cases under Massachusetts law habitually allow counsel to decide whether to request the § 60H instruction, and defense counsel often opt <u>not</u> to request it, for fear that juries will misinterpret it as a $500,000 floor rather than as a ceiling. <u>See</u>

-21-

Primus, 187 F. Supp. 2d at 2-3.  Defendant cannot, in retrospect, excuse a tactical decision on his part that resulted in the waiver of the instruction in question by the assertion that the trial judge is required to deliver the instruction regardless of the absence of a request for it or that the judge is similarly required to reduce the verdict to the statutory cap even when no instruction regarding the cap has been delivered.

Moreover, as the defendant conceded at oral argument, Primus's radical mastectomy and failed reconstructive surgery did, in fact, amount to a substantial disfigurement, thereby removing her case from the ambit of the § 60H cap.  Quite simply, there was no error in the failure to deliver the § 60H instruction.

For these reasons, we leave the amount of the jury's award unchanged.  There was no error in the district court's decision not to deliver the § 60H instruction, much less plain error.  Nor did the district court misinterpret the statute in refusing to read it as a mandate for an automatic post-verdict reduction in the size of the award, regardless of whether the instruction had been requested or delivered.

V.

The rulings of the district court are **affirmed**.  Costs are awarded to Primus.[6]

---

[6]  Primus's motion for sanctions for frivolous appeal, see Fed. R. App. P. 38, is denied.