**Sharon PRIMUS**

v.

**UNITED STATES of America**

**No. CIV.A.98–10549–RGS.**

United States District Court,
D. Massachusetts.

Oct. 23, 2003.

---

Robert F. Oberkoetter, South Dartmouth, MA, Rosario Mario Rizzo, Attorney at Law, Concord, MA, for Plaintiff.

Mary Elizabeth Carmody, U.S. Attorneys Office, Worcester, MA, for Defendant.

*FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT AFTER A NON–JURY TRIAL*

STEARNS, District Judge.

## BACKGROUND

The procedural posture of this medical malpractice case is somewhat unusual. In July of 1998, plaintiff Sharon Primus brought a medical malpractice suit against Dr. Earl Walker, a surgeon and a United States Air Force Colonel (now retired), who had treated her in 1991 and 1992 after she complained of a lump in her right breast.[1] When Primus was treated by Dr. Walker, she was living with her husband at Luke Air Force Base in Arizona. In 1992, Primus moved with her husband to Hanscom Air Force Base in Massachusetts. There, she was seen by, among other physicians, Dr. Richard Galgano, a primary care physician at a private medical clinic, Brighton Marine Health Center, Inc. (Brighton Marine). In 1995, Primus was diagnosed with breast cancer and underwent a radical mastectomy.

Also, in March of 1998, Primus brought a malpractice claim against Dr. Galgano in the U.S. District Court in Massachusetts. The case filed against Dr. Walker in Arizona was ultimately transferred to Massachusetts where it was consolidated with

---

1. The suit against Dr. Walker was brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), and 2671, in the U.S. District Court in Arizona. In due course, the United States substituted itself as the named defendant.

the Galgano case. Because FTCA claims must be heard by a judge rather than by a jury, *see* 28 U.S.C. § 2402, the case against Dr. Walker was tried to the court, while simultaneously, a jury heard the case against Dr. Galgano.[2] Another complicating factor is that while Massachusetts law governed the claims against Dr. Galgano, Arizona law applies to the case against Dr. Walker. (As a practical matter, however, there are no relevant differences in the malpractice law of the two states). The case against Dr. Galgano concluded on February 12, 2002, with the jury awarding Primus $500,000 in present damages and $960,000 as compensation for future pain and suffering. The non-jury trial involving Dr. Walker continued for several days thereafter. The Walker case was then suspended while the parties prepared for the appeal of the verdict against Dr. Galgano. On May 21, 2003, the First Circuit Court of Appeals affirmed the jury verdict and award of damages. *See Primus v. Galgano*, 329 F.3d 236 (1st Cir.2003).

## FINDINGS OF FACT [3]

1. Sharon Primus is a college-educated mother of two. Primus is married to Elegear Primus, a career United States Air Force officer. From 1989 to July of 1992, Primus lived in Phoenix, Arizona, at Luke Air Force Base, with her husband. Primus was employed at Luke Air Force Base as a medical librarian. On October 18, 1989, after feeling a lump in her left breast during a self-examination, Primus saw Dr. Susan Allen, her primary care physician.[4] After palpating a two centimeter lump, Dr. Allen ordered a mammogram.[5] NJT Tr. 4, at 13, 14. She then referred Primus to Dr. Larry Riddles, a Luke Air Force Base surgeon for a possible biopsy. Dr. Riddles, who saw Primus on November 1, 1989, was unable to palpate a lump. The mammogram did not reveal any dominant mass. Dr. Riddles' diagnosis was a fibrocystic breast condition.[6] He did not see any reason to perform a biopsy. During a physical examination on November 5, 1990, Dr. Allen was unable to palpate a mass in either of Primus's breasts. Dr. Allen also concluded that Primus's breasts were fibrocystic. NJT Tr. 4, at 19.

2. On July 19, 1991, Primus saw an Air Force surgeon, Dr. Earl Walker, at the Luke Air Force Base Surgical Clinic. Primus complained of a lump in her right breast. Dr. Walker palpated a 4 millimeter mass which appeared to him to be a cyst.[7] NJT Tr. 3, at 79. He found the left

---

2. Evidence that pertained solely to Dr. Walker was heard by the court outside the presence of the jury.

3. Record citations are to the transcript of the non-jury trial and are designated by day and page number as NJT Tr. X, at Y. The transcripts of the testimony of Dr. Houlihan and Dr. Allen from non-jury trial day four were separately produced. Consequently, both transcripts are numbered from page 1 to page X, despite the fact that Dr. Allen testified after Dr. Houlihan.

4. Primus testified that the 1989 lump was in her right and not her left breast. The medical records, as well as Dr. Allen's testimony, however, contradict her on this point. *See, e.g.,* NJT Tr. 4, at 14–15.

5. The First Circuit opinion, 329 F.3d at 238, mistakenly reports Dr. Allen as having testified to palpating a two millimeter lump.

6. Although Dr. Riddles recommended that Primus return for a three month follow-up examination, there is no indication in the medical record that she did so.

7. While there are documented cases of cystic carcinomas, they are "almost unheard of." NJT Tr. 8, at 37 (testimony of Dr. Susan Pories). Consequently, the diagnosis of a cyst is ordinarily considered by doctors who treat breast cancer to be a benign finding. *Id.*

breast to be normal. After taking an oral history, Dr. Walker ordered a mammogram and scheduled an appointment with Primus for August 8, 1991, to discuss the results. After reviewing the mammogram results with Colonel Walgren, the Chief of Radiology,[8] Dr. Walker diagnosed the lump, which appeared "very smooth" in texture, to be an expression of fibrocystic disease,[9] a benign condition.[10] NJT Tr. 3, at 87, 89–90. At the August appointment, Dr. Walker found the lump to be six millimeters in diameter. Id. at 87. The increase in the size of the lump between the July and August appointments was consistent, in Dr. Walker's opinion, with menstrual fluctuation. Dr. Walker scheduled a follow-up mammogram for January of 1992.

4. During a November 1991 physical examination, a physician's assistant noted no change in the size of the lump. NJT Tr. 8, at 36. During a December 18, 1991 visit to discuss the results of an abnormal pap smear, Dr. Allen, noting Primus's history of fibrocystic breast disease, recommended a further visit with Dr. Walker. Dr. Allen explained to Primus that Dr. Walker might want to drain the cyst or perform a biopsy. NJT Tr. 4, at 22–24.

5. The January mammogram showed no increase in the size of the lump. At a January 15, 1992 visit, Dr. Walker ruled out an ultrasound examination or needle aspiration as inappropriate, given the small size of the mass. NJT Tr. 3, at 94–96. He nonetheless recommended that Primus undergo a third mammogram in six months time as a precaution. He scheduled a fourth visit for July. Primus did not have the follow-up mammogram. Nor did she keep the July 1992 appointment with Dr. Walker.[11] Instead, in July of 1992, Primus relocated with her husband to Hanscom Air Force Base in Massachusetts. Her next significant medical appointment was a prenatal visit with Dr. Martin Gross, an obstetrician, in October of 1992. Dr. Gross noted a thickened spot in Primus's right breast. In November of 1992, Primus was seen by Dr. Michael Shaw, an oncologist, to investigate an abnormal pap smear. Dr. Shaw found Primus's breasts normal for a pregnant woman. She did not complain to either doctor of a lump in her breast.[12]

6. Primus saw Dr. Richard Galgano at Brighton Marine on October 12, 1993, for a complete medical examination.[13] Dr. Gal-

---

8. Colonel Walgren independently concluded that while both of Primus's breasts showed signs of moderate fibrocystic disease, there had been no change in the condition of her breasts since the 1989 mammogram and that her breasts were otherwise normal.

9. The term "fibrocystic disease" is something of a misnomer as density or "lumpiness" in the breasts, which is what the term means to describe, is usually considered a benign condition. The term has largely fallen out of use in modern medical parlance. NJT Tr. 3, at 11–12 (testimony of Dr. Janet Baum).

10. The significance of the finding of smoothness is that "a cancer is usually hard and irregular" to the touch. NJT Tr. 8, at 33 (testimony of Dr. Susan Pories).

11. In June of 1992, during a routine physical examination, an Air Force nurse noted a one centimeter cyst at an unspecified location in Primus's right breast.

12. A breast examination performed by Dr. Gross after the birth of Primus's child in April of 1993 disclosed no abnormalities.

13. The United States argues (in the alternative) that Primus was contributorily negligent in failing to follow Dr. Walker's instructions and that the failure of at least three, and possibly four, subsequent physicians (including Dr. Galgano) to diagnose her breast cancer were intervening and superceding causes relieving Dr. Walker of any liability. As I will conclude that Primus has failed to establish by a preponderance of the evidence that the lump palpated by Dr. Walker in 1991 was the

gano palpated a lump in Primus's right breast, and relying on Primus's oral account of her medical history at Luke Air Force Base, concluded that the lump was a benign cyst.[14] He did not obtain Primus's medical records, nor did he refer her to a surgeon.

7. On March 14, 1995, Primus presented to Dr. Daniel Melville, a general practitioner. Dr. Melville, after palpating the lump in Primus's breast, arranged for a mammogram and ultrasound. On March 28, 1995, the radiologist reported a possible breast malignancy. Dr. Melville immediately referred Primus to Dr. Kevin O'Donnell, a breast surgeon. While examining Primus the following day, Dr. O'Donnell noted an "obvious right breast carcinoma," and ordered a confirmatory biopsy. NJT Tr. 7, at 9. On May 12 1995, Dr. O'Donnell performed a mastectomy, removing Primus's right breast in its entirety and twenty-one of her lymph nodes, four of which proved cancerous.

### CONCLUSIONS OF FACT AND LAW

■ The principal issue with respect to Dr. Walker is whether the lump he palpated in July of 1991 was the source of the cancer found in Primus's right breast in March of 1995. The crucial testimony in this regard was offered by Dr. O'Donnell, the surgeon who performed Primus's mastectomy. The lesion on which Dr. O'Donnell operated was located deep in the up-

per outer quadrant of Primus's right breast. NJT Tr. 7, at 10. Following the initial operation, a frozen section diagnosis was performed by a pathologist to insure that the entire tumor had been removed.[15] According to the pathologist's findings, the tumor was growing aggressively, and at the time of its removal was 2.5 centimeters in diameter. Based on his review of Primus's medical history, including the Luke Air Force Base medical records, Dr. O'Donnell testified that he could not say whether the tumor he removed in March of 1995 was related to the lump palpated by Dr. Walker in 1991. *Id.* at 19–20.

Dr. O'Donnell's testimony was supported by Dr. Susan Pories, a Beth Israel Deaconess Medical Center (Beth Israel) breast cancer surgeon. Based on her study of the post-operative pathology reports and Primus's medical records, she concluded that, because of the tumor's rapid growth rate, the lesion removed from Primus's breast could not have originated from the mass palpated by Dr. Walker in 1991. NJT Tr. 8, at 50–51. Dr. Pories' testimony built upon that of Dr. James Connolly, a pathologist and the Chief of Anatomic Pathology at Beth Israel.[16] Dr. Connolly concluded from the pathology reports that Primus's tumor was a Grade III invasive ductal carcinoma with a very high S-phase fraction of 20.5%, indicating that the tumor was doubling in size approximately every thirty days.[17] Had the four

---

nascent tumor that flared into a carcinoma, it is unnecessary to address these arguments.

14. Dr. Kathleen Kelly, another Brighton Marine doctor, who examined Primus in October of 1994, apparently observed the same lump as did Dr. Galgano.

15. Based on the pathologist's finding, Dr. O'Donnell removed additional tissue from Primus's chest wall to insure a clean margin.

16. Dr. Connolly was one of the inventors of the grading system used by American patholo-

gists to quantify the invasiveness of cancerous tumors.

17. An S-phase fraction is a measure of the percentage of cells in a tumor that are in the phase of the cell cycle in which DNA is being synthesized. It is a method of determining the rate at which a tumor is growing. An S-phase fraction over 5% is considered high. NJT Tr. 7, at 33 (testimony of Dr. James Connolly).

millimeter mass detected by Dr. Walker in 1991 been the origin of the 2.5 centimeter lesion removed in 1995, it would have doubled eight times over the intervening four years, a rate too slow, in Dr. Connolly's opinion, to match the biology of the tumor removed from Primus's breast. NJT Tr. 7, at 32. "If we were looking at this particular case, I picked a 30–day doubling time, which I feel is quite fair in this case, but if this 4–millimeter lesion had been the same lesion that showed up as a 2.5 centimeter lesion, it would have been doubling once every 170 days, which would have been extremely slow for this constellation of findings." [18] *Id.* at 35. For that reason, Dr. Connolly concluded that there was "no way that [the two masses] could be related." [19] *Id.* at 38. Finally, Dr. Janet Baum, a radiologist and the Director of Breast Imaging at Beth Israel, testified that her examination of Primus's mammograms in 1989 and 1991 failed to disclose the existence of any abnormal masses. [20] NJT Tr. 3, at 18, 21. Dr. Baum also testified that given the state of the technology in 1991, she would not have recommended an ultrasound. NJT Tr. 3, at 21–22. Nor would she have attempted an aspiration because "I don't see a lesion to try to aspirate." *Id.* at 22.

A contrary opinion was presented by Dr. Mary Jane Houlihan, a breast surgeon and the Director of the Breast Care Program at Beth Israel. According to Dr. Houlihan, the mass detected by Dr. Walker in 1991 was the incipient tumor that metastasized in 1995. The basis of her opinion was evidently the similarity in location between the cyst palpated by Dr. Walker and the tumor eventually removed by Dr. O'Donnell. [21] However, Dr. Houlihan conceded on cross-examination that her opinion was based on an assumption and not on any scientifically proven fact. [22] While Dr.

---

18. According to Dr. Connolly, even had Primus suffered from an invasive carcinoma in January of 1992, it would have been of a size of less than one millimeter and therefore undetectable. NJT Tr. 7, at 71.

19. Dr. Connolly explained his opinion more fully as follows:

> DR. CONNOLLY: Her tumor was such an aggressive tumor that there was no way that it would have been present for that long a period of time.
> MS. CARMODY: Can you explain to the Court how you came to that conclusion?
> DR. CONNOLLY: Looking at the differentiation of the tumor, the mitotic count, the S-phase fraction, the patient's age, and what we know about the growth of breast cancer. There are some tumors that can be present for long periods of time. Those would be well-differentiated tumors or special types of breast cancers. But a high-grade invasive ductal carcinoma in a young patient is a very rapidly growing tumor, and it would not have been a palpable lesion, if present at all. It probably was not present at all back in 1991.

NJT Tr. 7, at 38.

20. By contrast, Dr. Baum was able to identify an asymmetric density with speculated margins (indicating malignancy) in the upper outer quadrant of Primus's right breast in her 1995 mammogram. NJT Tr. 3, at 25–27. She also testified that the 1991 mammogram showed no suspicious signs in the area of the breast from which the cancer was removed in 1995. *Id.* at 29.

21. As Dr. Houlihan testified: "What I am taking is the history that's in the charts that there was a mass in 1991 that wasn't worked up, and it persisted, and that this was where she ultimately had a cancer. And in—I'll stop there." NJT Tr. 4, at 118–119.

22. The significant testimony was as follows:

> MS. CARMODY: Now, your opinions here today, Doctor, are all based on the assumption that what was removed from Mrs. Primus in March [sic] of 1995 were—was the cancer. The cancer that was removed in March of 1995 was a palpable mass that Dr. Walker palpated in July of '91 and January of '92; is that correct?

Houlihan is a highly respected breast surgeon whose opinion cannot be discounted, I find it less persuasive than the contrary opinions of her Beth Israel colleagues. As demonstrated at trial, Dr. Houlihan, for whatever reason, had not been provided with all of Primus's medical records or the transcript of her deposition or those of her treating physicians, including Dr. Walker and Dr. Galgano. Nor was she given the films of the mammograms that had been taken in 1989, 1991, and 1992. While this is not a case of simply counting the number of opinions offered at trial and awarding the prize to the side with the larger number of agreeable witnesses, an opinion based on less than the full medical history of a patient almost by definition carries less weight than the opinions of equally respected doctors who had the benefit of the entire record in coming to their conclusions.[23]

■ The second issue, assuming that the cyst was a protean cancerous growth, is whether, given the state of medical science in 1991 and 1992, a reasonable and prudent Arizona breast surgeon would have undertaken the two investigative techniques recommended by Dr. Houlihan, a targeted ultrasound and/or a fine needle aspiration. Stated differently, was the failure of Dr. Walker to order or perform one or both of these techniques a deviation from the then applicable standard of care? On this point I am persuaded by Dr. Pories' testimony, which was confirmed by the medical literature cited at trial, that while ultrasonography was available in 1991 as a diagnostic tool, it was then in its infancy and generally incapable of visualizing a mass of less than two centimeters in diameter. NJT Tr. 8, at 18, 35. As Dr. Pories explained, without a means of visualization a fine needle aspiration of a mass four to six millimeters in size (as is possible today) would have been "close to impossible."[24] NJT Tr. 8, at 28. Consequently, Dr. Pories concluded that Dr. Walker had not deviated from the standard of care by failing to order an ultrasound or attempt a fine needle aspiration. NJT Tr. 8, at 34–35. Moreover, I did not understand Dr. Houlihan to essentially disagree with Dr. Pories on either point. On cross-examination, Dr. Houlihan agreed with the statement in an authoritative 1991 treatise on breast disease[25] that ultrasound in its then stage of development had proved incapable of detecting almost 50 percent of lesions smaller than two centimeters in diameter. NJT Tr. 4, at 91. She also agreed that the aspiration of a mass four to six millimeters in diameter is technically difficult under any circumstance

---

DR. HOULIHAN: That's correct.

MS. CARMODY: And you have no pathological or other studies that would tell you to a reasonable degree of medical certainty that the mass that he palpated was, in fact, the cancer that was removed in March of 1995; isn't that correct?

DR. HOULIHAN: That's correct.

MS. CARMODY: This is your assumption, not something that you base on any science; is that correct?

DR. HOULIHAN: That's correct.

NJT Tr. 4, at 109–110.

**23.** I find particularly telling the testimony of Dr. O'Donnell, the operating surgeon, that the lesion he removed was deep in Primus's

breast. NJT Tr. 7, at 10. Dr. Walker testified that the mass that he palpated was superficial. NJT Tr. 5, at 94. As Dr. Houlihan testified, it is difficult to palpate a mass under one centimeter in diameter unless it is close to the surface of the breast. NJT Tr. 4, at 93.

**24.** According to Dr. Pories, even today a biopsy is inconsistent with the standard of care, particularly with younger women patients, as a biopsy carries all of the risks associated with surgery, including bleeding, infection, adverse reactions to medicine, and scarring. NJT Tr. 8, at 19.

**25.** J. Harris, S. Hellman, I.C. Henderson and D. Kinne, *Breast Diseases* (2d ed. 1991).

and that a doctor attempting to aspirate a mass this small could miss it entirely without ever knowing of the error. *Id.* at 93.

██ Under Arizona law, a plaintiff in a medical malpractice case must produce affirmative evidence to establish a causal relationship between a doctor's allegedly negligent acts and the harm that she ultimately suffered. *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297, 302 (1977). Moreover, she must also prove by expert testimony (unless the negligence is "grossly apparent") that the doctor "failed to exercise the degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within [Arizona] acting in the same or similar circumstances." [26] A.R.S. § 12–563. *See also Valencia v. United States,* 819 F.Supp. 1446, 1463 (D.Ariz.1993). As Primus has failed to meet either burden by a preponderance of the evidence, judgment must enter for Dr. Walker.

### ORDER

For the foregoing reasons, the court finds for the defendant Dr. Walker. Judgment shall enter accordingly.

SO ORDERED.

26. While Dr. Houlihan did not testify to the standard of care as it pertained to Arizona, both Dr. Houlihan for the plaintiff and Dr. Walker's expert witnesses agreed that in 1991 the standard of care for the diagnosis and treatment of breast cancer was by and large uniform across the country. *See* NJT Tr. 7, at 28 (testimony of Dr. Mary Jane Houlihan); NJT Tr. 8, at 18 (testimony of Dr. Susan Pories); NJT Tr. 3, at 8 (testimony of Dr. Janet Baum).