**Irina PERESYPA, et al., Plaintiffs**

v.

**JIMINY PEAK MOUNTAIN RESORT, INC., Defendant.**

**C.A. No. 08–30055–MAP.**

United States District Court, D. Massachusetts.

Sept. 15, 2009.

Michael J. DeGregorio, George DeGregorio, Massimiano & McCarthy PC, Pittsfield, MA, for Plaintiffs.

David B. Mongue, Donovan & O'Connor, LLP, Adams, MA, for Defendant.

### MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' MOTION TO AMEND COMPLAINT, AND DEFENDANT'S MOTIONS TO STRIKE

(Dkt. Nos. 13, 25, 31, and 33)

PONSOR, District Judge.

## I. INTRODUCTION

Plaintiff, Irina Peresypa[1] ("Peresypa"), was seriously injured when she struck a snow gun while skiing at the ski area operated by Defendant, Jiminy Peak

---

1. Leonid Peresypa, Irina's father is also named as a party in his capacity as her next friend. For simplicity, the term "Plaintiff," as used in this memorandum, refers to Irina Peresypa.

Mountain Resort, Inc. She asserts that Defendant's negligent rental of ski equipment, negligent marking of trails, negligent marking of the snow gun she struck, and negligent padding of that snow gun caused her injuries. Pursuant to the scheduling order entered by Magistrate Judge Neiman, Defendant had the option to delay the naming of expert witnesses until after the court ruled on its motion for summary judgment if it filed its motion by March 31, 2009. Defendant met that deadline. Shortly after Plaintiff opposed Defendant's motion for summary judgment, both parties filed additional motions. Plaintiff moved to amend her complaint, and Defendant filed two motions to strike. All four motions are now before the court. For the reasons set forth below, the court will allow Defendant's motion for summary judgment, in part, and deny the motion to amend and motions to strike.

## II. BACKGROUND [2]

Late in the afternoon on March 23, 2007, Plaintiff, who as a child had been skiing once, arrived at Jiminy Peak with Michael Shifrin ("Shifrin"), who had never been skiing, and Michael Promyslovsky ("Promyslovsky"), who considered himself an intermediate skier. None of them had ever been to Jiminy Peak before. All three bought lift tickets and Promyslovsky picked up a printed trail map. On the trail map beginner trails were marked by a green circle, and low intermediate trails were marked by a green circle in a blue square. The map showed eight lifts serving forty-four trails. Three of the lifts served only beginner trails. Two other lifts transported skiers from the base of the mountain to the summit.

On the main map, the Left Bank trail, one of several trails that began at the summit, was correctly marked as a beginner trail, but on an inset map showing just summit trails Left Bank was incorrectly marked as a low intermediate trail. The West Way trail also began at the summit. It was correctly marked on the main and inset maps as a low intermediate trail.

After buying lift tickets, the three friends proceeded to the rental shop to rent equipment. Plaintiff's rental form, completed by Defendant's employee, indicated that she was given "5–290–DD" boots. The "290" was an in-house size designation that roughly corresponded to a woman's U.S. shoe size of three to four-and-a-half. The size marked on the boots themselves was twenty-two, a size designation within the Mondopoint system, commonly used for alpine skis. The parties do not agree about the corresponding woman's U.S. shoe size. Defendant's employees who rented ski boots were directed to ask the renter whether the boots they had been given were comfortable. Though Plaintiff normally wore a U.S. woman's size five-and-a-half or six shoe, there is no evidence that she found the boots she was given were too tight, or that she made any complaint about them.

Elsewhere on the rental form Defendant's employee indicated that the "visual indicator" setting on both ski bindings, also known as the DIN number, was set to three. Higher DIN numbers indicate tighter bindings, meaning that greater pressure is required for them to release. When the bindings were examined after the accident it was determined that, contrary to the written form, the DIN number was actually set at six on both bindings, which Defendant concedes was tighter

---

**2.** The following facts are set out in the parties' 56.1 statements. Plaintiff is unable to recall any events from the day of her accident, so the 56.1 statements draw on the deposition testimony of other individuals and various documents. Disputed facts are noted.

than appropriate for someone of Peresypa's size and experience. In conjunction with the same post-accident examination, the employee completing the written Post Incident Equipment Investigation Report (Dkt. No. 20, Tab G.) placed inconsistent markings in two boxes, appearing to indicate both that the forward pressure setting on one ski passed a test and that it failed the same test. A failure on the forward pressure test would have indicated that the binding might have released with less pressure than should have been required for the corresponding DIN number.

Once Plaintiff and her friends had rented equipment, they declined the three lifts serving beginner's trails and proceeded to the Berkshire Express lift, one of the lifts that went to the summit. While riding the lift to the top of the mountain, Promyslovsky looked at the main portion of the map he had picked up earlier, *i.e.*, the portion of the map that correctly marked the Left Bank trail as a beginner's route. Nevertheless, he advised Plaintiff to "go to the right," away from this easier trail, upon disembarking from the lift. This direction led towards the West Way trail, a low intermediate trail. To the left, the Left Bank trail was marked by a green circle as an easy trail and designated as a non-speed zone.

It is undisputed that, on both the inset of the printed trail map and on the large trail map posted near the lifts at the summit, the Left Bank trail was incorrectly marked as a low intermediate trail, when it was actually a beginner trail. Promyslovsky recalls directing the group to the West Way trail, away from the easier Left Bank trail, based on his perusal of the paper trail map while riding the lift. Shifrin recalls the group stopping at the top of the mountain to look at the large trail map before proceeding to the right. In other words, despite the clear and correct nota-

tion on the map he consulted of a beginner's trail to the left (Left Bank), Promyslovsky directed the party to the right to a low intermediate trail (West Way). No evidence suggests he ever consulted the erroneous paper map inset, or trail board map, in making his decision.

The deposition testimony of the third member of the party, Shifrin, was slightly different. He offered no testimony regarding any conversation about their route during the ride up on the lift, but he recalled that the three of them looked at the large trail map board briefly from a distance of two to three meters when they arrived at the summit. He testified that they were "looking for something specific"—he does not state what—but also that they "didn't study the map per se." (Dkt. No. 18, Ex. C, Shifrin Dep. 30, l. 12–13.) He does not recall the substance of the conversation the three had while they looked at the trail map, or any specific discussion with either of the other two members of the party about which way to go, apart from the fact that they were looking for "what seemed to be the easiest route." (*Id.* at 30, l. 14–15.) When asked specifically why it was that the group went to the right as opposed to going left, he testified at his deposition, "I don't know why." (*Id.* at 34, l. 12.)

Plaintiff and her friends began their descent on the West Way low intermediate trail. Partway down the trail, a beginner trail, Lower Glade, branched off to the right from the West Way trail. The parties do not agree about whether that trail was open for skiing at the time of Plaintiff's accident. Based on Promyslovsky's recollections, Plaintiff argues that the record is sufficient to justify a jury in finding that the trail was closed, and that she and her friends would have used the trail had it been open. The court will accept this

rendition of the facts for purposes of this motion.

As the group descended West Way, Plaintiff took the lead. Promyslovsky became concerned when he saw her speed up near the intersection with the Riptide and Upper Fox trails. He yelled at her to "sit down" and, when she did not respond, he went into a "tuck" to increase his speed in order to catch up with her. As he approached to within about ten feet of her, Plaintiff skied straight into a snow gun installed near the intersection of the West Way and Grand Slam trails.

The parties do not agree about the nature or extent of the padding in front of the snow gun or whether the gray pipe was marked by an orange and black hazard pole, and for purposes of Defendant's motion for summary judgment the court will assume the gun lacked padding in its upper portion and lacked markings.

Promyslovsky saw the lower portion of Plaintiff's body strike padding and the upper portion of her body strike the unpadded snow gun. After the accident he saw that one of Plaintiff's skis had released while the other one, probably the right one, was still attached and twisted under her. Shifrin did not see the accident. Plaintiff was knocked unconscious by the collision and remained so until sometime after she was removed from the scene. She suffered serious injuries and has no recollection of the accident.

## III. *DISCUSSION*

### A. *Plaintiffs' Motion to Amend the Complaint.*

Several days after opposing Defendant's motion for summary judgment, Plaintiff moved to amend her complaint to add four additional counts. The first three additional claims—(1) breach of express warranty, (2) breach of implied warranty of merchantability, and (3) breach of implied warranty of fitness for a particular purpose—all relate to the rented ski equipment. Plaintiffs also seek to add a claim for gross negligence related to the marking of the trail and/or the marking and padding of the snow gun.

■ Pursuant to Fed.R.Civ.P. 15(a), a plaintiff, as a matter of right, may amend a complaint once before the defendant files a responsive pleading. After the defendant has filed a responsive pleading, "[c]onsent to file amended pleadings 'shall be freely given when justice so requires,' unless the amendment would be futile or reward undue delay." *Adorno v. Crowley Towing & Transp. Co.,* 443 F.3d 122, 126 (1st Cir. 2006) (quoting Fed.R.Civ.P. 15(a)). However, "[o]nce a scheduling order is in place, the liberal default rule is replaced by the more demanding 'good cause' standard of Fed.R.Civ.P. 16(b)." *Steir v. Girl Scouts of the USA,* 383 F.3d 7, 12 (1st Cir.2004). Plaintiffs' Motion to Amend came more than one year after they filed their complaint, several months after the close of non-expert discovery, and nearly a month after Defendant filed its motion for summary judgment in keeping with the scheduling order issued by Magistrate Judge Neiman. Given this timeline and the absence of a compelling justification for Plaintiffs' lack of diligence in pursuing these new claims, the motion simply comes too late. It will therefore be denied.

### B. *Defendant's Motion for Summary Judgment.*

"At the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine

issue for trial "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The court must grant a motion for summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ "To prevail on a negligence claim under Massachusetts law, a plaintiff must show by a preponderance of the evidence (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury." *Primus v. Galgano,* 329 F.3d 236, 241 (1st Cir.2003) (internal citations omitted). Defendant asserts that the record evidence is insufficient to support a negligence verdict against it on any of the three theories offered by Plaintiffs. As to the first theory—that Defendant was negligent in its provision of rental ski equipment—Defendant argues that Plaintiffs have failed to make a *prima facie* case as to either breach or causation. As to the latter two theories, Defendant invokes the Massachusetts Ski Safety Act ("MSSA"), Mass. Gen. Laws ch. 143, §§ 71N–71O (2008), contending that under that statute it had no duty either to mark the trails or to mark or pad the snow gun in the manner Plaintiffs claim.

### 1. *Rental Equipment.*

Defendant contends that it is entitled to summary judgment because there are in-sufficient facts in the record to persuade a reasonable jury either that it breached a duty owed to Plaintiff, or, if there was a breach, that this action or inaction by Defendant bore any causal link to Plaintiff's injuries. As noted above, Defendant concedes that the DIN numbers on the bindings were set at six, higher than the appropriate setting of three, but argues that no jury could reasonably conclude on this record that either binding failed before or during the accident, or that the ski boots were improperly sized. Alternatively, Defendant contends that even if a jury found that the binding somehow did not perform properly, or that the boots fit poorly, no jury could find that either of these conditions contributed to the accident or to Plaintiff's injuries.

With regard to the bindings, following Plaintiff's accident an employee of Defendant completed a Post Incident Equipment Investigation Report. (Dkt. No. 20, Tab G.) On that report there are handwritten markings inconsistently indicating both that the forward pressure was correct and that it was incorrect, on one of the skis. No explanatory comments were provided. Plaintiffs' expert relied on these ambiguous markings to conclude that the forward pressure had in fact been incorrect, meaning it did not correspond with the visible DIN number, which was incorrectly set to six. Though he had the opportunity to examine the ski and conduct his own forward pressure testing, he did not do so. Nevertheless, in his affidavit accompanying Plaintiffs' opposition to Defendant's motion for summary judgment, he faulted Defendant for not testing the bindings using a Vermont Calibrator.

Shortly after Plaintiffs filed their opposition, Brian Roden, an employee of Defendant—perhaps responding to the Plaintiff's expert's criticism—conducted Vermont Calibrator testing and found that the bind-

ings were within or exceeded the appropriate ranges for a DIN setting of five and a half or higher. (Dkt. No. 40, Roden Aff. 2.) This finding meant that the actual configuration of the binding was functionally correct for the listed DIN setting of six, and certainly not too loose. A binding failing the forward pressure test would have measured out below the five to six range.

■ Plaintiffs' expert attempts to discredit this later testing, and perhaps explain his failure to conduct such testing, by suggesting that the settings on the bindings had been changed and made tighter after the accident. Mere speculation of this type, especially when it involves a serious accusation of evidence tampering, is insufficient to create a material issue of fact at the summary judgment stage. *Collier v. City of Chicopee*, 158 F.3d 601, 604 (1st Cir.1998) ("[A] summary judgment motion cannot be defeated by conclusory allegations, harsh invective, empty rhetoric, strained inferences, or unsupported conjecture.").

In sum, the evidence of record would support a jury's conclusion that Plaintiff's bindings were tighter than appropriate at five-and-a-half or six, rather than three, but certainly not that they were too loose. As will be seen below, however, no jury could conclude that this condition played any role in Plaintiff's accident or injuries.

The evidence is flatly insufficient to support Plaintiff's claim that the boots Defendant rented Plaintiff were too small. The boots were a size twenty-two in the Mondopoint system. The size conversion charts provided by the parties indicate that a size twenty-two ski boot corresponds with either a U.S. woman's size four or five. Defendant itself assigned the boots' size designation within its own system as corresponding to a U.S. woman's three to four-and-a-half. Plaintiff alleges

that she normally wears a woman's size five-and-a-half.

The difference between this normal shoe size and the various converted sizes of the ski boots she was wearing at the time of the accident is the only evidence offered by Plaintiff that the boots were too small. Neither of the two men who accompanied Plaintiff when she rented her equipment has offered testimony or other evidence that Plaintiff objected to the boots she was given or that she tried to get another size. No evidence suggests there was any shortage of rental boots in her preferred size at the time she rented her equipment. Without some evidence that Plaintiff's ski boots actually fit improperly, the vagaries of a shoe size conversion chart are insufficient evidence that the boots she was wearing on the day of the accident were too small.

■ Even if the court believed Plaintiff had put forward sufficient evidence as to a breach related to the settings on the bindings or boot size, she has offered no evidence from which a reasonable jury could conclude that either the bindings or the erroneous shoe size contributed to her accident or injuries. James Isham, Plaintiffs' expert, stated generally that missized boots have a potential to affect a skier's stance and balance—a hypothetical proposition that, standing alone, is hard to debate—but his testimony did not actually explain the role that the improperly sized boots might have played in causing this particular accident.

As to the improper binding settings, Isham offered conflicting explanations of what was wrong with them and how these problems might have contributed to Plaintiff's accident or injuries. Initially, Isham opined that the setting on one of the bindings was too loose, and therefore caused the connected ski to release prematurely,

propelling Plaintiff in an upward direction as she struck the snow gun and allegedly causing her to strike her head above the padding. (Dkt. No. 18, Ex. Q, Isham Rep. 9.) Following receipt of Defendant's testing indicating that the forward pressure was not improperly loose on either binding, Isham offered an alternative explanation. (Dkt. No. 42, Tab A, Isham Supp. Aff. 4.) He noted then that there was a berm of snow around the snow gun and opined that Plaintiff's bindings should have released in the fragmentary moment after she hit the berm and before she struck the snow gun, but that due to the excessively *high* pressure setting one binding failed to release. The failure of one ski to release, according to the expert, might have caused her to hit the snow gun with more force and velocity, leading to more serious injury.

The factual bases for either of Isham's two theories are inadequate. Isham relied on Promyslovsky's recollection that following the accident one ski was no longer attached to Plaintiff's boot, though Promyslovsky was not able to remember seeing the ski come off. (Dkt. No. 18, Ex. D, Promyslovsky Dep. 56, 88.) No evidence is offered as to how the loss of a ski, at some undetermined point, caused presumably by *too loose* a binding led to the accident or enhanced Plaintiff's injuries. The second theory—that the binding was *too tight* and that its failure to release a split second prior to the accident enhanced Plaintiff's injuries by increasing her speed—is similarly without any evidentiary basis beyond speculation and say-so. No evidence suggests the binding would have released if it were looser, and no evidence suggests that the force of the collision would have been significantly reduced if the binding had released a split second earlier.

In sum, both because evidence of actual negligence (regarding the shoe size) and evidence of a causal link between any putative negligence and Plaintiff's accident (regarding both the shoe size and the bindings) is absent from the record, Defendant is entitled to summary judgment as to any claim related to rental equipment.

### 2. *Trail Markings.*

Plaintiffs also contend that Defendant was negligent in failing to mark its trails and their level of difficulty with accurate signs posted on the trails themselves and on the trail maps. In order for Plaintiff to succeed on this theory of negligence, she must show that Defendant owed her a duty to mark its trails properly and that its breach of that duty in some way caused her accident. As with her rental equipment claim, Plaintiff can show neither.

Defendant's duty to mark its trails is defined by the Massachusetts Ski Safety Act ("MSSA"). Mass. Gen. Laws ch. 143, §§ 71O–71N (2008). At the time of Plaintiff's accident ski operators had three explicit duties under the MSSA:

(1) the duty to maintain a sign system in accordance with the rules and regulations of the Recreational Tramway Board ("Board"); (2) the duty to conspicuously place notice and indicate the location of snow making equipment when such equipment "is being employed"; and (3) the general duty to maintain and operate its ski area in a reasonably safe condition or manner.

*Eipp v. Jiminy Peak, Inc.*, 154 F.Supp.2d 110, 114 (D.Mass.2001) (Neiman, J.) (citing Mass. Gen. Laws ch. 143, § 71N). The Board had previously promulgated specific rules regarding signage, but in February 2006, prior to Plaintiff's accident, the regulations were amended and the specific

signage requirements were eliminated.[3] As a result of this gap, at the time of Plaintiff's accident, ski area operators' only statutory duties were to place conspicuous signs to warn of snow-making equipment in use, and to operate their premises in a reasonably safe manner. No specific requirements related to the posting of other signs or markings existed at the time Plaintiff was injured. Thus, beyond a general duty to operate its ski area reasonably safely, Plaintiff can point to no duty imposed on Defendant to mark its trails at all as of the date of the accident.

While the ski area's duty to post signs was limited and somewhat vague, the duty of skiers was spelled out clearly in the MSSA. The law placed "the duty to avoid any collision with any . . . object on the hill below" solely on the skier, so long as the object was not improperly marked. *Id.* at § 710. One of the reasons why that duty was solely on the skier was because under the MSSA the skier was "presumed to know the range of his [or her] own ability to ski on any slope, trail or area." *Id.* at § 710.

 Here, there is a certain irony in Plaintiff's "markings" argument. This is not a case where Defendant is charged with, for example, luring Plaintiff onto an expert slope by inaccurately marking it as a beginner's. Negligent marking of this kind might very well violate Defendant's general duty to maintain its ski area in a reasonably safe manner, even without a more specific statutory or regulatory enactment. On the contrary, however, in this case it is undisputed that the Defendant's marking oversight, if any, involved the denotation of a beginner's trail as low intermediate. Thus, someone skiing the allegedly mis-marked trail would find it less challenging than advertised. Plaintiff's argument tries to turn this normally innocuous situation to her advantage by arguing that, if the group had *known* that the Left Bank trail was a beginner's trail, they would have taken it instead of the low intermediate West Way, and Plaintiff would have been less likely to fall. Since both the Left Bank and West Way trails were, on some markings, labeled as low intermediate, the argument runs, she was misled into taking the actual low intermediate trail, West Way, because she was presented no gentler alternative.

This argument, however, collides with the factual record, which confirms that (a) Plaintiff never looked at any of the markings either on the paper map or on the board at the summit; (b) her companion Promyslovsky relied on the main portion of the paper map in directing the party to the right towards the correctly marked low intermediate West Way trail, ignoring the correctly marked Left Bank beginner's trail; and (c) her companion Shifrin recalls looking at the trail map board but has no recollection of exactly why and does not recall how it was the group decided to go right rather than left. The tragic but undisputed fact is that Plaintiff and her friends eschewed the beginner's trails both in choosing to ride to the summit and in choosing how to descend. No evidence suggests they were actually misled by any trail marking.

The facts of this case simply do not warrant making an exception to the gener-

---

3. Those regulations were at 526 C.M.R. §§ 8.00 *et seq.* In 2006, the regulations established by the Recreational Tramway Board were amended and sections one through nine were removed and those numbers reserved for future amendments. The effective date of that change was February 10, 2006, more than a year before Plaintiff's accident. New, more comprehensive, signage requirements were adopted on June 26, 2009 and are available at 526 C.M.R. § 10.16.

al statutory rules that a skier is presumed to know her own level of skill and has an obligation to avoid collisions with objects. Plaintiff and her companions indisputably made the decision to forego the lifts to the beginners' slopes, to ascend to the summit of the mountain, and to ski on a low intermediate trail that was correctly designated as such on the map they consulted.

The notion that Plaintiff and her friends, having already passed up the other beginners' slopes, would have taken Left Bank, which was properly marked on the main paper map as a beginner's trail, but was inaccurately identified as low intermediate in the inset and the board at the summit, is entirely speculative. The undisputed fact of record is that Plaintiff knew that she was skiing on a trail that was not intended for beginners, and under the MSSA it was her duty to assess her ability and properly control her speed and direction. Defendant owed no duty to Plaintiff that was breached by its trail markings, nor did any erroneous marking play a part in the accident. It is therefore entitled to summary judgment on this claim.

### 3. *Snow Gun Marking/Padding.*

■ Plaintiff asserts that the ski gun she struck was in the skiable area of the trail, was unmarked, and was inadequately padded. Defendant responds that the snow gun was indisputably off the trail and that it had no duty, as a matter of law, to mark or pad the snow gun regardless of whether, as a matter of fact, the snow gun was on or off the trail. Having viewed the photographs of the trail and the snow gun, the court concludes that whether the snow gun was on or off the trail and whether it was adequately marked and padded are questions for a jury. (Dkt. No. 20, Tab B, B–38, B–40, B–43, B–44.) Defendant's vigorous, and strongly supported argument that the snow gun was plainly visible for a substantial distance, even without a marking, still leaves the question, however slim, for a jury.

Defendant is certainly correct that there is no duty for ski operators to mark obstacles off the trails. *Id.* at § 71N. As discussed above, ski area operators have a duty to mark obstacles like snow guns that are on the trail in accordance with regulations, but there were no regulations in effect at the time of Plaintiff's accident. Defendant argues that in the absence of valid regulations, it had no duty to mark snow guns that were not in use, even if they were on the trail.

■ The court disagrees. As noted above, though the MSSA imposes a duty on skiers to ski within their ability and avoid collisions, it is also the ski area operator's duty to operate ski areas "in a reasonably safe condition or manner." *Id.* This duty is simply incompatible with the notion that a ski area operator could place an obstacle or create some other hazard on the skiable area of a trail and have no duty to mark the hazard. Ski area operators have no specific duty under the MSSA to pad obstacles and do not assume such a duty by padding some obstacles. *Walsh v. Jiminy Peak, Inc.*, No. 02–11890–MAP, 2005 U.S. Dist. LEXIS 18463 at *13–*18 (D.Mass. Aug. 29, 2005). However, their general duty to operate the ski area in a reasonably safe manner may in certain circumstances include a duty to pad specific obstacles. *See Eipp v. Jiminy Peak, Inc.*, 154 F.Supp.2d 110, 116 (D.Mass. 2001). As there are factual questions regarding the actual location of the snow gun in relation to the skiable area of the trail and whether it was adequately marked and padded, Defendant's Motion for Summary Judgment will be denied as to this claim. Although the trial will present challenges for Plaintiffs, they are entitled to their day in court on this claim.

### C. *Defendant's Motions to Strike.*

Defendant has filed two motions to strike. In the first motion (Dkt. No. 31), Defendant asks the court to strike portions of Plaintiff's expert's affidavit and the corresponding portions of Plaintiff's 56.1 statement. The court has already concluded that Defendant is entitled to summary judgment as to the rental ski equipment and the marking of trails, even if all of Isham's conclusions in paragraphs two, five, six, seven, and eight of his affidavit are considered. Defendant has also asked the court to strike paragraph four of Isham's affidavit in which he opines that the snow gun was on the trail. Having considered Isham's opinion together with the other record evidence, the court has determined that the jury must decide whether the snow gun was on or off the trail. The court therefore denies Defendant's motion as moot.

Defendant's second Motion to Strike (Dkt. No. 33) seeks to have certain other portions of Plaintiff's 56.1 statement struck because they are in improper form and lack proper evidentiary support. Several paragraphs in Plaintiff's 56.1 response include sentences that begin "a jury could reasonably conclude." Defendant asserts that each of these sentences should be stricken because they ask the court to determine that the record evidence legally warrants finding a particular fact to be true. Plaintiff replies that it was her intent to simply highlight areas of dispute that, in her belief, are sufficient to keep this case alive. The court read the sentences as Plaintiff intended, not as Defendant feared. The court therefore will deny Defendant's second Motion to Strike.

### IV. *CONCLUSION*

For the reasons set forth above, the court hereby DENIES Plaintiffs' Motion to Amend the Complaint (Dkt. No. 25) and DENIES Defendant's two Motions to Strike (Dkt. Nos. 31 and 33). The court hereby ALLOWS Defendant's Motion for Summary Judgment as to Plaintiff's claims related to the ski equipment Defendant rented to Plaintiff and the marking of trails, but DENIES the motion as to Plaintiff's claims related to the marking and padding of the snow gun Plaintiff struck (Dkt. No. 13).

This case shall proceed in accordance with the scheduling order entered on July 30, 2009 (Dkt. No. 43).

It is So Ordered.